United States Court of Appeals,

Eleventh Circuit.

No. 94-8485.

UNITED STATES of America, Plaintiff-Appellee,

v.

Daniel M. PARADIES, The Paradies Shops, Inc., Paradies Midfield Corporation, Ira Jackson, Defendants-Appellants.

Sept. 23, 1996.

Appeals from the United States District Court for the Northern District of Georgia. (No. 1:93-cr-310), Anthony A. Alaimo, Judge.

Before TJOFLAT, Chief Judge, COX, Circuit Judge, and WELLFORD[*], Senior Circuit Judge.

WELLFORD, Senior Circuit Judge:

Defendants Ira Jackson,[1] Daniel Paradies, The Paradies Shops, Inc., and Paradies Midfield Corp.,[2] were convicted pursuant to a 133 count indictment charging them with various offenses arising out of the operation of the concessions at the Atlanta Hartsfield International Airport.  The bulk of the charges involved mail fraud

---

[*]Honorable Harry W. Wellford, Senior U.S. Circuit Judge for the Sixth Circuit Court of Appeals, sitting by designation.

[1]Ira Jackson was the first black person elected to the Atlanta City Council and served from 1970 to 1990.  In the 1960's, Jackson opened several retail stores, including grocery stores, auto parts stores, and tire dealerships, but went bankrupt in 1978 and 1979.  As councilman, he developed close ties with the Atlanta political power structure, especially with airport operations and with the law firm utilized by the mayor.

[2]Daniel Paradies, the individual, will be referred to herein as "D. Paradies."  The Paradies Shops will be referred to as "Shops," and Paradies Midfield will be referred to as "Midfield." D. Paradies, Shops, and Midfield, collectively, will generally be referred to as "the Paradies defendants."  The Paradies companies and D. Paradies filed separate briefs, and each have adopted the others' arguments by reference.  Therefore, unless specifically stated otherwise, we deem the arguments raised by one to be made by and to inure to the benefit of the others.

(18 U.S.C. §§ 1341, 1346, and 2), conspiring to make corrupt payments to public officials (18 U.S.C. §§ 371, 666), and tax fraud (26 U.S.C. § 7206). The defendants challenge their convictions and their sentences on several grounds which were imposed after a lengthy jury trial.

Two fraudulent schemes were involved in the indictment. In the first, the government alleged that Jackson and D. Paradies, the largest subconcessionaire at the Atlanta airport, conspired to profit from Jackson's influence as an Atlanta City Council member and as the Commissioner of Aviation. According to the government's theory, Jackson used his political position to reduce the rent of the concessionaires, including the Paradies defendants, by very substantial amounts. In return Jackson, who allegedly owned an interest in the Paradies businesses, reaped benefits through payments from D. Paradies, which purported to be fees and dividends. In the second alleged scheme, which was much less complicated, D. Paradies and another subconcessionaire, Harold Echols, regularly gave cash to Jackson and other City Council members for favorable votes in matters before the Council in which the Paradies defendants (and other concession operators) had an interest.

The particular circumstances surrounding the fraudulent schemes were fervently disputed at trial. The facts set out below are those which the jury might reasonably have found from the evidence properly admitted at trial.

I. *STATEMENT OF THE CASE*

*A. The Airport Concessions Program*

The City of Atlanta owns and controls the Atlanta airport. From its opening in 1980, Dobbs Paschal Midfield Corp. ("Dobbs") was the principal concessionaire, managing all the airport concessions under contract with the City. Dobbs contracted with various subconcessionaires, including the Paradies defendants, to provide food, merchandise, and services. The subconcessionaires paid rent to Dobbs based on the greater of a percentage of sales or a guaranteed minimum. In turn, Dobbs agreed to pay the city a percentage of sales or a guaranteed minimum of $240 million over the first 15 years of operation. Dobbs' agreement with the City required that at least twenty percent of the total dollar volume of the concessions program be produced or controlled by minority controlled enterprises. That contractual provision provided the defendants an incentive to work out their schemes.[3]

D. Paradies was president and principal shareholder of Shops, a major gift shop chain at airports across the country. D. Paradies was also president of Midfield, a company which contracted to operate exclusively the gift shops in the airport in 1979. Shops owned sixty-five percent of Midfield's stock, and the other thirty-five percent was owned by minority controlled businesses in accordance with the minority participation requirement.[4] That

---

[3]Wilbourn, a McDonalds franchisee, was greatly enriched by these and other private affirmative action and set-aside programs in becoming involved as an MBE participant in several Atlanta operations and with D. Paradies in airport operations across the country. Although intended to benefit a segment of Atlanta's population the set-aside, unfortunately, resulted in pollution of the political process insofar as the lucrative airport concession business was concerned.

[4]Dobbs required a thirty-five percent minority interest in Midfield for reasons unexplained.

thirty-five percent was comprised of three corporations that were wholly owned by black persons, Mack Wilbourn,[5] Nathaniel Goldston, and Joanne McClinton. Wilbourn's business, Kinley Enterprises, Inc. ("Kinley"), held 18.3% of Midfield stock; Goldston's business, Airport Enterprises, Inc. ("AEI"), held 13.7%; and McClinton's business, Estate Management ("Estate"), held 3%. As was provided for in the shareholder agreements, the minority members supposedly received a management fee of 1.1% of Midfield's gross receipts. Midfield also paid Shops a management fee of 9% by mailing checks on a monthly basis.

*B. Jackson's Loan/Purchase from Goldston and Wilbourn*

By the spring of 1985, D. Paradies' relationship with the first minority shareholders group soured. At that point, the government contends, D. Paradies sought to include defendant Jackson as a minority participant in Midfield. D. Paradies and Jackson were close personal friends. In 1980, Paradies and Echols hosted the wedding reception for Jackson and his bride, Maudestine "Mimi" Simmons.[6]

In April of 1985, Paradies wrote a "personal and confidential" letter to Jackson requesting Jackson's assistance in obtaining space for additional shops in the airport. If the space was obtained by October 1, 1985, Paradies stated, the minority

---

[5]Wilbourn was a defendant in this case, but was acquitted at trial. His role in the fraud will be set out below.

[6]Additionally, Mimi and D. Paradies' wife, Billie Paradies, were close friends. One of the alleged fraudulent "loans" was put in Mimi's maiden name. When the fraud was uncovered, D. Paradies claimed that he did not know that Maudestine Simmons and Mimi Paradies were one and the same person.

shareholders would receive an increase in management fees to 2%. If the space were not obtained, the fee would remain at 1.1% for those shareholders. Under the government's theory, D. Paradies' letter was an invitation to Jackson to capitalize on a near doubling of the minority participants' management fee increase. Soon thereafter, Jackson began to negotiate with Goldston to purchase his interest in Midfield.

Goldston told Jackson that he was experiencing financial difficulty, and purportedly offered to sell Jackson his stock in Midfield for $50,000. Jackson made a "loan" to Goldston for $50,000 through his wife Mimi, operating as Metro Consultants, Inc.[7] The government maintained that the purported loan was, in fact, a purchase by Jackson of Goldston's interest. Indeed, Jackson's check to Goldston on his personal checking account specified: "For Metro Consultants—Purchase Stock." The government also introduced agreements which purportedly transferred Goldston's Midfield stock in the name of AEI to Metro Consultants. On October 1, 1985, moreover, Midfield terminated its management agreement with Goldston and entered into a new comparable agreement with Jackson's wife. Mrs. Jackson was to render administrative assistance in return for her portion of the 1.1% management fee. Also, in order to qualify as a minority business, Metro Consultants had to be certified as a minority-owned company. Jackson asked the Atlanta Office of Contract Compliance to expedite the certification for Metro Consultants because his wife wanted to "buy out" Goldston

---

[7]All the participants in the schemes formed separate corporate entities to engage in airport operations.

and Wilbourn.

After Jackson had already distributed the "loan proceeds," he appeared before the City's Board of Ethics for an opinion on the propriety of his "loan." Jackson told the Board that he had loaned $50,000 to Goldston, and that his wife wished to purchase Goldston's and Wilbourn's interests in Midfield. He also stated that Wilbourn's "asking price" was $275,000. Jackson also testified that he had discussed the matter with D. Paradies. Jackson assured the Board that if the transaction were approved, he would not vote on any airport concessions matters, and that he wanted to be "up front" with the Board. Noting, among other things, that subconcessionaires issues came before the Council frequently, and that Jackson's interest could have at least an indirect influence on Council decisions, the Ethics Board disapproved of the proposed purchase. Such an acquisition by Jackson and his wife, the Board concluded unanimously, would violate the Code of Ethics and would result in a breach of Jackson's fiduciary duty to the City.[8] According to the Ethics

---

[8]The "Disclosure of Interest" section of the Atlanta Code of Ethics provides in part:

> [A]ny council member ... who has a private interest, direct or indirect, in any proposed legislation or any decision pending before such person or the body of which the person is a member or employee, shall not vote for or against, discuss, decide or in any way participate in considering the matter, but shall publicly disclose, on the official records of the body, the nature and extent of such interest, prior to any determination of the matter.

Section 18-2008 of the Atlanta City Code, entitled "Investments in Conflict with Official Duties," provides in part:

director, Jackson told him that he disagreed with the Board's decision, but that he would "not undertake to do indirectly what [the] board had told him could not be done directly."

After the Ethics Board's decision, Jackson entered into another disputed transaction with Wilbourn, who, according to Jackson, was experiencing financial difficulty.[9] Purportedly, Jackson "loaned" Wilbourn $275,000 (the exact asking price identified by Jackson in his Ethics Board testimony) from Options International, Inc. ("Options"), a corporation created in the name of his son, Ira Jackson, Jr., but controlled by Jackson himself.[10] The transaction was to be effected in two installments: $150,000 immediately, and $125,000 payable on May 1, 1987. Wilbourn used $50,000 of the proceeds to buy Goldston's stock, and transferred all of his and Goldston's interest in Midfield to Hartsfield Concessions, Inc. ("Hartsfield"), a company purportedly wholly owned by Wilbourn. The loan from Options was secured by all the revenue from Wilbourn's interest in Midfield. The stock in Midfield, Jackson claims, was never transferred to him as security

---

[No] ... council member ... shall invest, or hold any investment directly or indirectly, in any financial, business, commercial or other private transaction which creates a conflict with or adversely affects his official duties to the detriment of the city.

[9]The Paradies Companies maintain that Wilbourn needed the money to finance another minority enterprise opportunity in the Atlanta underground.

[10]The evidence was overwhelming that Options was a Jackson alter ego.

for the loan.[11]

The government argued that this was a sham loan agreement so that Wilbourn, doing business as Hartsfield, would be the minority participant in Midfield "on paper" only and that Jackson was the *de facto* owner, reaping the full benefits of Wilbourn's interest in Midfield. There is evidence, together with reasonable inferences, that supports the government's contention. Jackson admits in his brief that, upon Wilbourn's counsel's recommendation, Jackson was given some control over the funds of Hartsfield, and that Jackson was authorized to accept payments directly from Midfield. Indeed, evidence showed that Jackson initially went to the Paradies company offices to pick up the dividend and management checks, which were made payable to Hartsfield, *then later these checks to Hartsfield were mailed to Jackson directly.* The evidence also showed that the first twenty-three Hartsfield management fee checks were personally endorsed by Jackson and ultimately deposited into his own personal bank account.

Between December, 1985, and March of 1992, D. Paradies paid Jackson, through Hartsfield, fees and dividends, more than $1,049,000, nearly four times the amount of the original $275,000 "loan." After the minority interests were transferred to Hartsfield, Wilbourn never received another payment from the Paradies Companies, and he had no further substantial contact with Midfield. The government showed that Jackson had complete control

---

[11]D. Paradies states in his brief, however, that Hartsfield pledged to Option its stock in Midfield, as well as the fees and dividends. D. Paradies concludes in his brief that "Mr. Jackson thus came to have a financial interest in Mr. Paradies' corporation."

over the Hartsfield bank account (making deposits, writing and signing checks, and making tax returns), despite Jackson's claims that he never had "control of Hartsfield Concessions, Inc. or use[d] funds from the corporation for personal loans or payments." (Jackson's Brief at p. 10.)  The proof indicated, however, that after checks were deposited into the Hartsfield account, Jackson would immediately transfer the money to his own corporation, Options, which transacted no business except the receipt of funds from Hartsfield.  Through this "dummy" corporation, Jackson spent hundreds of thousands on such items as a $350,000 condominium on Peachtree Road in Atlanta, and another very expensive luxury home on Hilton Head Island, furnishings for his Atlanta residence, $100,000 in securities, and a $200,000 investment in a printing company.

*C. D. Paradies' Involvement in the Loan/Purchase Transactions*

The Paradies defendants claim that they did not know of Jackson's interest, and claimed that they were being prosecuted for making routine business payments to Hartsfield Concessions. (Paradies Co.'s Brief at pp. 6-7.)  The government showed, however, that when Jackson picked up his check, D. Paradies himself would occasionally escort Jackson to the pertinent office. Additionally, D. Paradies' secretary testified that D. Paradies, Jackson, and others attended a meeting at D. Paradies' office.  During the meeting, she was asked to draw up an agreement wherein Jackson was named as a minority participant.  Later, she was asked to substitute Wilbourn's name for Jackson's, and to perform the highly unusual task of destroying the documents that named Ira Jackson.

Perhaps the most damning evidence of D. Paradies' involvement in this scheme was that which showed that D. Paradies himself actually helped Jackson fund the $275,000 loan/purchase made to/from Wilbourn. In April of 1987, the second installment of $125,000 was due from Jackson to Wilbourn. Around that time, D. Paradies made a $50,000 loan to Jackson and declared and paid a $50,000 dividend to Hartsfield Concessions on the same day. Jackson deposited the $100,000 into the Hartsfield Concessions bank account and paid off loans that were taken to fund the payment to Wilbourn. While D. Paradies' brother, Jimmy Paradies, testified at trial that the loan was made to help out Wilbourn because Wilbourn was experiencing financial difficulty, Wilbourn testified that he knew nothing about that loan. D. Paradies and Wilbourn were not even on speaking terms at the time. *Id.* Additionally, Jackson signed a personal guarantee for the repayment of the loan, which was kept on file at the Paradies offices. Govt. Exhibit 33 (attached to Brief). In July of 1988, D. Paradies paid Hartsfield Concessions a dividend of $72,000. Jackson deposited the check and, the very next day, repaid the $50,000 loan to D. Paradies from the Hartsfield Concessions account.

Evidence also showed that on at least two occasions when Paradies needed the signatures of the minority participants, D. Paradies' employee sent the documents to Jackson, instructing him to obtain the signatures of Goldston or Wilbourn. *See* Govt. Exhibits 41, 42. D. Paradies' employee testified that he sent them to Jackson because at that point "everything was going through Ira."

*D. Jackson's Acquisition of McClinton's 3% Interest Through Help of D. Paradies*

In August, 1988, Hartsfield Concessions purchased McClinton's interest in Paradies Midfield for $11,000. At trial, McClinton testified that she was willing to sell because she had made almost no money from her venture. In fact, D. Paradies had instructed his employee to withhold McClinton's management fees or dividends because he "didn't like" McClinton. At the time of the sale, McClinton had accrued $11,455, of which she had no knowledge. After Hartsfield Concessions, via Jackson, paid McClinton the $11,000 purchase price, Midfield (via D. Paradies) paid Hartsfield Concessions McClinton's $11,455 in back dividends. After the transfer, the management fees paid to Hartsfield Concessions were increased to 1.5%.

*E. Jackson Uses Political Influence to Help the Paradies Companies*

From the early 1980's on, the subconcessionaires were engaged in efforts to reduce their rent at the airport. Many amendments to Dobbs' contract with the City were made, reducing the rent that Dobbs charged the subconcessionaires, and in turn, reducing the revenues paid to the City from Dobbs. Jackson concealed his interest in the Paradies Companies, and used his position on the Council to advance the interests of the subconcessionaires.

In July of 1987, Jackson voted in favor of Amendment Number Five, which substantially reduced the rent charged to the subconcessionaires. The government claims that Amendment Five cost the city about $1 million. D. Paradies received $1.5 million of the total $2.3 million in rent reduction.

In 1989, Jackson supported another rent-reduction proposal

that came before the board, and it included contract extensions for the subconcessionaires.  Jackson was put on a negotiating team to represent the City against Dobbs.  Some of the members of the team argued that only the smaller subconcessionaires should receive further rent reductions.  Jackson argued adamantly that the larger subconcessionaires should also receive reductions.   He was successful, and Amendment Number Six cost the City $7.7 million. D. Paradies saved over $2.5 million in rent.  Interestingly, around the time Amendment Six was being negotiated, Hartsfield Concessions' management fees were raised to 2.0%.  Richard Dickson, Paradies' "right hand man," testified that the increase was financially indefensible.

In October of 1990, the City's Commissioner of Aviation was to retire.  The evidence showed that Jackson approached Mayor Maynard Jackson and asked to be appointed in the position.  The mayor had heard rumors that Jackson had some kind of interest in an airport concession, but received assurances from Jackson he owned no such interest.  Jackson was eventually appointed Aviation Commissioner.

Soon after he took his position, Jackson proposed that the City terminate Dobbs' position as Principal Concessionaire and allow him, as Commissioner of Aviation, to take over the entire concessions program.  The government claims that the program would have resulted in over $40 million reduction in revenue to the City. The proposal encountered substantial opposition, and Jackson became indignant toward opponents.  The government claims that during the controversy, Paradies and Echols visited the Mayor and the City's Chief Administrative Officer to "lobby" them to stay close to

Jackson and consider his proposal. (Govt.'s Brief at p. 27.) Jackson's proposal was put on the Council's agenda, but the CFO blocked the vote.

*F. Jackson's Interest is Discovered*

Shortly after the vote was blocked, the City Attorney and Mayor Jackson confronted Jackson about his interests. Jackson denied any financial connection with D. Paradies. On March 8, 1992, Jackson resigned his position, stating that "I now find that a loan which I extended to a sub-concessionaire at the airport some time ago, and which has long been repaid, has become an issue of concern."[12]

Soon thereafter, D. Paradies wrote a letter to Max Walker, the acting Commissioner of Aviation, stating that he was

> surprised and distressed to learn of Mr. Ira Jackson's alleged interest in and receipt of funds from Hartsfield Concessions, Inc.... At all times, Paradies Midfield has dealt with Hartsfield Concessions, Inc. through Mr. Mack Wilbourn, who represented himself to be the sole owner of Hartsfield Concessions, Inc.... Paradies is unaware of any alleged interest of Mr. Jackson in Hartsfield Concessions, Inc.

*See* Govt. Exhibit 106. The government claims that when the newspapers learned of the Goldston/Maudestine Simmons transaction, D. Paradies claimed that he did not know that Maudestine Simmons was Jackson's wife, even though he had hosted their wedding reception and "Mimi" was his own wife's close friend.

*G. Direct Payoffs to City Council Members*

The other scheme involved D. Paradies and his agreement to make corrupt payments with Echols to Atlanta City Council Members,

---

[12]In fact, Jackson caused papers to be backdated to make it appear that the "loan" had been paid as the investigation proceeded.

including Jackson. Echols testified at trial that he and D. Paradies had been close for 22 years. He testified that he and D. Paradies had a long-standing agreement that Echols would make payments to certain council members, and that D. Paradies would reimburse him.

Echols testified that he made routine payments to Jackson, Buddy Fowlkes, and less frequent payments to Marvin Arrington, President of the City Council. Echols explained that between mid-1980 through 1992 he would meet Jackson for breakfast on Wednesday mornings at the Castlegate Hotel. Echols always paid for breakfast, and afterwards would pay Jackson several hundred dollars folded in a handshake. He had a similar routine with Fowlkes on Thursday mornings. Further, Echols paid for Fowlkes to fly back from vacation to vote for Amendment Six. Additionally, Echols paid for Fowlkes and his family to take a Florida vacation. As for Arrington, Echols paid him once or twice every two months, usually at breakfast, depending on what was before the Council. On two occasions, Echols paid Arrington to appoint Buddy Fowlkes to Chairman of the Transportation Committee. Echols paid $5,000 on one occasion, and $6,000 on another.

In 1987 and in 1990, D. Paradies allegedly reimbursed Echols for the payoffs. In 1987, D. Paradies paid Echols for "consulting fees" in three payments of $10,000 each. Echols did not do any counselling for this money. Although consulting agreements were drawn up, Echols told Ron Wright that the money was not for consulting, but was for political payoffs.

In 1990, soon after Echols had flown Fowlkes back to vote for

Amendment Six, D. Paradies reimbursed Echols in three payments for $1,666, $333, and $2,000. That time, no consulting agreements were drawn up; three "invoices" were sent to account for these payments.

The evidence also showed that Jackson accepted a $5,000 payoff from Echols and another subconcessionaire, Dave Gammill. In December of 1988, Gammill allegedly brought $25,000 in cash to Echols, who distributed the money to Jackson, Arrington, Fowlkes, and others.

*H. Proceedings Below*

On July 9, 1993, a federal grand jury returned a 133-count indictment charging the defendants with various offenses. Counts 1-83 charged all the defendants with mail fraud (one count for each check) in violation of 18 U.S.C. §§ 1341, 1346, and 2 based upon the scheme involving Jackson's interest in Paradies Midfield. Count 84 charged defendant Wilbourn, who was acquitted, of witness tampering in violation of 18 U.S.C. § 1512(b)(1). Count 85 charged D. Paradies with conspiring with Echols to violate 18 U.S.C. § 666 by making corrupt payments to public officials in violation of 18 U.S.C. § 371. Counts 86-128 charged Jackson with the receipt of corrupt payments from Echols in violation of 18 U.S.C. § 666. Counts 129-133 charged Jackson with subscribing to false income tax returns underreporting his income in violation of 26 U.S.C. § 7206(1).

At trial, Jackson denied the charges against him, maintaining that his dealings with Wilbourn, D. Paradies, and others were neither illegal nor fraudulent. He claimed he acted upon the

advice of his attorney and his accountant. D. Paradies and his companies claimed that under their concession contracts at the Atlanta airport under Atlanta ordinances they were required to enter into minority participation agreements with persons such as Wilbourn and others in their business enterprises. They denied knowingly doing anything unethical, illegal, or fraudulent, or having knowledge of Jackson's allegedly fraudulent activity and conflicts of interest. D. Paradies and his companies particularly contended that they only made contractually obligatory payments of dividends and fees to Jackson and others.

The jury was sequestered, and the case was tried for three straight weeks, including weekends. After six hours of deliberations, the jury returned a verdict of guilty for all defendants on all counts, except for Jackson's acquittal as to Count 129, and Wilbourn's acquittal. Jackson received 42 months in prison, a $7,500 fine and a special assessment of $6,500. Paradies received 33 months in prison, a $7,500 fine and a special assessment of $4,200. The Paradies Shops was fined $1,500,000 and assessed $16,600. Paradies Midfield was assessed $16,600. Jackson and D. Paradies remain free on appeal bonds. The fine imposed on the Paradies Shops was stayed pending appeal.

II. *ANALYSIS*[13]

*A. Jury Selection*

---

[13]In addition to the issues discussed in this opinion, the defendants raised other less meritorious ones. We find that those issues do not warrant discussion, and "summarily affirm the district court as to all issues not herein discussed." *See United States v. Waymer,* 55 F.3d 564, 568 (11th Cir.1995), *cert. denied,* --- U.S. ----, 116 S.Ct. 1350, 134 L.Ed.2d 519 (1996).

According to the Jury Selection and Service Act ("the Jury Selection Act"), 28 U.S.C. §§ 1861, *et seq.,* the court may excuse a potential juror (1) upon a showing of undue hardship or extreme inconvenience, or (2) if the potential juror may be unable to render impartial jury service or that his service as a juror would be likely to disrupt the proceedings.[14]  *See* 28 U.S.C. § 1866(c). In this case, the district court sent a 25-page, 108-question jury questionnaire to over 250 potential jurors.[15]  The court reviewed the returned questionnaires and excused over 70 potential jurors pursuant to § 1866(c) and in accordance with the Local Plan for the Northern District of Georgia ("Local Plan").  Jackson and the Paradies defendants argue that the district court committed a "substantial violation" of the Jury Selection Act by excusing those jurors *sua sponte* prior to voir dire, because the questionnaires

---

[14]Section 1866(c) provides in pertinent part:

> [A]ny person summoned for jury service may be (1) excused by the court ... upon a showing of undue hardship or extreme inconvenience, ... or (2) excluded by the court on the ground that such person may be unable to render impartial jury service or that his service as a juror would be likely to disrupt the proceedings, or (3) excluded upon peremptory challenge as provided by law, or (4) excluded pursuant to the procedure specified by law upon a challenge by any party for good cause shown, or (5) excluded upon determination by the court that his service as a juror would be likely to threaten the secrecy of the proceedings, or otherwise adversely affect the integrity of jury deliberations.

28 U.S.C. § 1866(c).

[15]While the district court entered an Order on July 11, 1994, stating that there were "approximately 250" jurors in the venire, this court found two groups of juror questionnaires, one included approximately 150 jurors, and the other included an even larger number.  Whatever the actual number, it was an unusually large venire.

provided insufficient evidence of actual bias and undue hardship.[16] The district court's determinations regarding bias and undue hardship are reviewed for an abuse of discretion. *See United States v. North,* 910 F.2d 843, 909-10 (D.C.Cir.1990), *modified on other grounds,* 920 F.2d 940 (D.C.Cir.1990), *cert. denied,* 500 U.S. 941, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991).

A party challenging the jury selection process under the Jury Selection Act must make his challenge "before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor, *whichever is earlier.*" 28 U.S.C. § 1867(a) (emphasis added). The timeliness requirement "is to be strictly construed, and failure to comply precisely with its terms forecloses a challenge under the Act." *United States v. Bearden,* 659 F.2d 590, 595 (5th Cir. Unit B 1981), *cert. denied,* 456 U.S. 936, 102 S.Ct. 1993, 72 L.Ed.2d 456 (1982). Therefore, once voir dire begins, Jury Selection Act challenges are barred, even where the grounds for the challenge are discovered only later. *See United States v. Hawkins,* 566 F.2d 1006, 1013 (5th Cir.), *cert.*

---

[16]Jackson stated in his brief that the court's excusal of certain jurors violated his "Sixth Amendment right to a fair trial." The substance of his brief, however, refers only to the Jury Selection Act, not to the Sixth Amendment. *See* Jackson's Brief at pp. 16-21. His reference to the Sixth Amendment may be a method by which Jackson seeks to avoid the strict timeliness requirements of a statutory claim. *United States v. Grisham,* 63 F.3d 1074, 1077 (11th Cir.1995) (allowing constitutional claims even though statutory claim is untimely), *cert. denied,* --- U.S. ----, 116 S.Ct. 798, 133 L.Ed.2d 746 (1996). In any event, we will address only the merits of Jackson's statutory claim. Any constitutional claim raised by Jackson would fail for the same reasons as does the same claim made by the Paradies defendants. *See, infra,* note 28 and accompanying text.

*denied,* 439 U.S. 848, 99 S.Ct. 150, 58 L.Ed.2d 151 (1978); *United States v. Kennedy,* 548 F.2d 608, 613 (5th Cir.), *cert. denied,* 434 U.S. 865, 98 S.Ct. 199, 54 L.Ed.2d 140 (1977). Jackson admits in his brief that his counsel learned of the juror excusals during the weekend immediately before trial and that, therefore, he did not make his challenge to the jury selection process until the first day of trial. Jackson does not attempt to excuse his failure to comply with the timeliness requirements of the statute. Under these circumstances, Jackson's challenge is barred.[17]

The Paradies defendants, however, filed a timely motion under the Jury Selection Act and submitted an affidavit in support thereof. The Act requires that any motion filed pursuant thereto be accompanied by "a sworn statement of facts which, if true, would constitute a substantial failure to comply with the provisions of [the Act]." 28 U.S.C. § 1867(d). When that requirement is not satisfied, the challenge to the selection process must fail, because "Congress left no room for ad hoc review of the usefulness of compliance with [the sworn statement] requirement." *Kennedy,* 548 F.2d at 613; *see also United States v. Maldonado,* 849 F.2d 522, 523 (11th Cir.1988) (the Act's "sworn statement" requirement is to be strictly construed); *United States v. Green,* 742 F.2d 609, 612 (11th Cir.1984) (compliance with the Act's procedural requirements is necessary to challenge the validity of a jury selection plan).

---

[17]Even if we were to consider Jackson as having impliedly joined with the Paradies defendants' timely motion, his challenge under the Jury Selection Act would fail for the same reasons as does the challenge of his codefendants.

The "sworn statement" submitted by the Paradies defendants was the affidavit of a rejected juror, Dana Shepherd. Shepherd's affidavit showed, by tracking the statutory language, that she was excused from serving on the jury in this case despite the fact that (1) she would have met the basic requirements to serve on the "qualified wheel" of potential jurors, (2) she was not a member of an occupational class or group of persons who are exempted from jury service, and (3) she did not have a basis on which she could have individually requested excusal from jury service.[18] In other words, she has met the minimum requirements to be placed on the qualified wheel of potential jurors. The affidavit does not show, however, that there could be no other reason upon which the court could have based its decision to excuse her, *e.g.,* undue hardship or bias. Therefore, the affidavit does not state facts which, if

_____

[18]Shepherd showed that she met the minimum requirements under the Local Plan by attesting that she (1) is over the age of 18, (2) is competent to fill out the affidavit, (3) received, completed, and returned the jury questionnaire sent to her by the court, (4) had been excused from serving on the *Jackson* case but was to remain on call for a two-week term, (5) is a citizen of the United States and has been a resident of Atlanta, Georgia, for over one year, (6) is able to read, write, and understand the English language with sufficient proficiency to fill out the questionnaire, (7) is able to speak the English language, (8) has not been convicted of a felony, (9) is not in active service in the armed forces, (10) is not a member of the Fire or Police Department, (11) is not a public officer, (12) has not served on a grand or petit jury in the federal court in the past two years, (13) does not have active care and custody of small children, (14) is not essential to the care of aged or infirm persons, (15) is not over 70 years of age, and (16) is not a part of volunteer safety personnel. The language of her affidavit almost exactly tracks the language in the Local Plan. *See* N.D.Ga.Local Rule 120-1, Appendix A, §§ VI, VII, & VIII (incorporating 28 U.S.C. § 1865).

true, would constitute *any* violation of the Jury Selection Act.[19] Consequently, the Paradies defendants failed to satisfy the "sworn statement" prerequisite to a claim under the Act, and their challenge thereunder is precluded.

Even if we were to assume that Shepherd's affidavit satisfied the requirements of § 1867(d), we would find that the district court did not "substantially fail" to comply with the Jury Selection Act. *See* 28 U.S.C. § 1867(d) (allowing relief under the Act "[i]f the court determines that there has been a substantial failure to comply with the [Act]"). A Jury Selection Act violation is substantial only if it frustrates the Act's two basic goals: "(1) random selection of juror names; and (2) use of objective criteria for determination of disqualifications, excuses, exemptions, and exclusions."[20] *United States v. Gregory,* 730 F.2d 692, 699 (11th Cir.1984), *cert. denied,* 469 U.S. 1208, 105 S.Ct. 1170, 1171, 84 L.Ed.2d 321 (1985).

The Paradies defendants claim that thirteen jurors, individually, were improperly excused for bias, and eight jurors

---

[19]The Paradies defendants do not even claim that the district court's excusal of Dana Shepherd was improper. In fact, she stated in her questionnaire that she "regularly" saw H. Lamar Mixon (a named partner in the law firm representing Paradies Midfield), with whom she had a "godmotherly" relationship. Moreover, she virtually admitted her inability to render impartial service when she stated that she had met D. Paradies several times and "would feel funny" being in the courtroom with him. Under these circumstances, it would have been difficult for Ms. Shepherd to execute an affidavit that would have satisfied the requirements of § 1867(d).

[20]The relief to be afforded for a "substantial violation" under the Act is not reversal, but it is a stay of the proceedings for the court to make a determination regarding the propriety of the jury selection process. *See* 18 U.S.C. § 1867(d).

were improperly excused for undue hardship.[21]  They argue that the questionnaires of the jurors excluded for bias did not contain sufficient evidence of *actual* bias, citing *United States v. Calabrese,* 942 F.2d 218 (3d Cir.1991), and that the questionnaires of the jurors excluded for hardship did not show that the potential jurors would suffer hardship for the reasons listed in the Local Plan.  Additionally, they claim that seventeen questionnaires are "missing" for unknown reasons, and that their lack of access to those documents impedes their ability to assess whether the trial court acted in an appropriate manner.

This court has carefully reviewed all of the questionnaires challenged by the defendants, and we find that the district court did not commit a substantial violation of the Act in excluding those jurors.  With respect to those who were excused for bias, every potential juror either professed that they were badly prejudiced against one side, or they described a relationship that the court deemed inappropriate for a juror in this case.[22]  We find

---

[21]The Paradies defendants did not claim that the basic process for choosing jurors in the Local Plan was unconstitutional.  *See United States v. Pepe,* 747 F.2d 632, 648–49 & n. 17 (11th Cir.1984) (citing *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979)).  In order to substantiate a claim that the process was defective, the defendants would have had to show, among other things, that the district court was excluding a distinctive group in the community from the jury venire, and that the underrepresentation of that group was due to the systematic exclusion of the group in the selection process.  *Id.*  These defendants could not support such a claim, because they do not even identify any specific group that is excluded due to the process outlined in the Local Plan.

[22]The jurors listed the following circumstances relating to bias:  (# 27) stepfather was married to Jackson's sister;  (# 66) husband is prosecuting attorney in Cobb County;  (# 84) friend of and worked for Jackson;  (# 87) worked for Paradies;  (# 113) worked as consultant to the city and Mr. Cook (attorney for

that this action by the district court was not, nor was it alleged to have been, directed to any ethnic, racial, or national origin, nor did it constitute any arbitrary, unreasonable exclusion of discrete segments of the venire. Nor did the court's action in this respect cause the venire to consist of anything other than a fair cross-section of the community. This court has rejected a similar challenge to a district court's excusal of jurors "who merely acknowledged their acquaintance" with the defendant. *United States v. Bailey,* 468 F.2d 652, 658 (5th Cir.1972) (quoting *Dennis v. United States,* 339 U.S. 162, 168, 70 S.Ct. 519, 521, 94 L.Ed. 734 (1950)). The *Bailey* court relied on the district court's "serious duty to determine the question of actual bias and a broad discretion in its rulings" in dismissing the defendant's challenge to the jury composition.[23] *Id.* (finding "nothing abusive or prejudicial in the excusal of jurors admittedly acquainted, regardless [of] how remotely, with one of the parties to the proceedings"). The Paradies defendants rely on *Calabrese* wherein the Third Circuit rejected the notion that the district court has

Paradies) is son-in-law's friend; (# 128) mother works for Judge Shoob (niece of Paradies); (# 138) works for IRS; (# 153) parents are friends of Paradies; (# 270) had clear perception that dishonest business was involved at airport; (# 297) first cousin of district attorney; (# 343) prejudiced, but requested excusal for medical reasons; (# 376) prejudiced against the defendants. Only one "bias" juror's questionnaire, (# 89), was not found in the record. The district court, however, stated that that juror suspected shenanigans at the airport, and this court has been given no reason to discount that finding of the court.

[23]We recognize that *Bailey* dealt with challenges, rather than *sua sponte* action, but the decision establishes that the district court had broad discretion in dismissing jurors who have friendships, acquaintances, and other connections with parties to the lawsuit.

the broad discretion allowed by the Fifth Circuit in *Bailey.* *Calabrese* is not binding on this court, however, and it is our view that the reasoning in *Bailey* governs this case.[24] *See United States v. Perkins,* 748 F.2d 1519, 1532-33 (11th Cir.1984) ("A relationship between a juror and defendant, albeit a remote one, can form the basis of a challenge for cause."); *see also North,* 910 F.2d at 909-10 (upholding excusal of jurors before voir dire based on juror questionnaires); *United States v. Redmond,* 546 F.2d 1386, 1389 (10th Cir.1977) (upholding excusal of jurors who were acquainted with any attorneys in the case); *cert. denied,* 435 U.S. 995, 98 S.Ct. 1645, 56 L.Ed.2d 83 (1978).

Similarly, the court did not err in excluding the eight jurors for undue hardship. The Paradies defendants argue that the court allowed some jurors to use a hardship excuse for reasons other than those named in the statute. For example, juror # 290 was excused for having two small children, but her two children were sixteen years old. The Local Plan, however, allows a hardship excuse to potential jurors with children under ten years of age. The defendants also criticized the court for excusing some of these

---

[24]In any event, *Calabrese* is clearly distinguishable on its facts. In that case, the district court judge sent out a form letter to approximately 300 jurors, and asked two main questions, (1) Do you know the defendants, and (2) Will you be able to serve on a four to six week trial. All of the potential jurors who answered "yes" to the first question were excused. The Third Circuit found that this "acquaintance-based excusal" was inappropriate under the Act. *Calabrese,* 942 F.2d at 226. The method of the district court in *Calabrese* was notably different from the method of the district court in this case. Here, the jurors' questionnaire was 25 pages long and consisted of over 100 questions, and explanations for each answer was requested therein. Therefore, this case involved "far more compelling connection than mere acquaintance." *Id.* (distinguishing cases involving more than mere acquaintance).

jurors even though the jurors did not request excusal. Again, this court has reviewed all of the available questionnaires, and we find no substantial error in the court's actions.[25] While the court may have violated some of the technical provisions of the Local Plan in dismissing some jurors and without one of the enumerated hardships, none of the excusals frustrated the goals of the Act. *See United States v. Gregory,* 730 F.2d 692, 700 (11th Cir.1984) (technical violations alone do not give rise to a substantial violation of the Act), *cert. denied,* 469 U.S. 1208, 105 S.Ct. 1170, 1171, 84 L.Ed.2d 321 (1985); *see also United States v. Barnette,* 800 F.2d 1558, 1568-69 & n. 14 (11th Cir.1986) (upholding district court's granting of hardship excuse to 245 out of 249 jurors after a personal, pre-voir dire review of juror questionnaires), *cert. denied,* 480 U.S. 935, 107 S.Ct. 1578, 94 L.Ed.2d 769 (1987). Additionally, under § 1869(j) of the Jury Selection Act, "undue hardship and extreme circumstances" includes "any other factor which the court determines to constitute an undue hardship or extreme inconvenience to the juror." In the instant case, where the jury would be sequestered for several weeks, the court has broad discretion in determining whether a particular juror could be excluded because of undue hardship. Finally, defense counsel's

---

[25]The jurors listed the following circumstances relating to undue hardship: (# 7) mother is 87 years old and in nursing home; (# 60) has hearing problems, needs hearing aid; (# 195) has three children seven years and younger; (# 254) has two children, ages four and two; (# 276) no questionnaire, judge released him on grounds of hardship; (# 290) two small children, both sixteen years old; (# 294) sent note in lieu of questionnaire, has two children, ages five and two; (# 340) requested excusal for business hardship, but also professed that he "assume[d] Jackson and other defendants are guilty."

failure to locate a small portion of the juror questionnaires (some of which were never returned), from literally hundreds of questionnaires comprising several boxes in the record of this case, is no basis for a finding of failure on the part of the district court to follow legal procedures in jury selection.[26]

We note that the district court in this case was faced with an onerous burden in arriving at an impartial jury in this high-profile case that was originally estimated to last four to six weeks.[27] With great care, the court reviewed all of the returned jury questionnaires to rule out those jurors who would have been unduly burdened by serving on a case of that duration who admittedly would have been unable to render impartial jury service. Under these circumstances, the district court in no way hindered the random selection of juror names or the use of objective criteria in excusing jurors. Nor did the process result in impermissible discrimination or arbitrariness, and the defendants do not make such an allegation. In sum, the court did not commit a substantial violation of the Jury Selection Act, and the Paradies defendants are not entitled to a reversal on that basis.[28]

The Paradies defendants also claim, as a separate basis for

---

[26]The Paradies defendants did not object to the jury finally impaneled. They did, however, make an unsuccessful challenge based on *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), but the district court's ruling on that issue was not asserted as an error on appeal.

[27]Indeed, the Paradies defendants moved for a change of venue because of claimed widespread prejudicial publicity in Atlanta.

[28]For the same reasons, any argument based on the Sixth Amendment right to a fairly selected and impartial jury would also fail. *See Green,* 742 F.2d at 611.

reversal, that the district court violated their unqualified right to inspect the jury records in order to substantiate their claim under the Jury Selection Act. At about 8:00 on the morning of voir dire, after approximately 115 potential jurors had been summoned to appear in court at 11:00 a.m. for the proceedings, the Paradies defendants moved the court to stay the proceedings on the ground that the court possibly committed a substantial failure to comply with the provisions of the Act. The district court denied the motion for the stay, rejecting the defendants' argument that the exclusion of Dana Shepherd from the jury venire may have been a violation of the Jury Selection Act. Later that same day, the court read into the record its reasons for excusing the jurors that it dismissed *sua sponte.* The court thereafter, upon defendants' request, made the jury questionnaires a part of the record. Additionally, after trial, the court allowed the defendants to supplement the record with additional jury selection materials. At no time did the court preclude defense counsel from inspecting the record and finding out which jurors the court had excused. On the contrary, the record shows that the court entered an order on November 8, 1993, directing all counsel not to disclose answers of prospective jurors because that information was deemed to be privileged. From that date on, counsel for both sides were presumably aware that the questionnaires existed and that counsel would be entitled to review them. At most, the court denied the Paradies defendants additional time to formulate their argument. Therefore, we find, after careful examination of this record, that these defendants were not denied access to the jury selection

documents.

*B. Propriety of the Convictions Pursuant to 18 U.S.C. § 1346*

Jackson and the Paradies defendants challenge their convictions pursuant to 18 U.S.C. § 1346 on several grounds. First, the Paradies defendants claim that in order to be convicted for aiding and abetting in the fraudulent scheme, an independent duty to the victim must first exist and that duty must have been breached. Second, they claim that § 1346 is unconstitutionally vague, or, in the alternative, that the district judge should have given the jury a "fair warning" instruction to allow the jury to make the vagueness determination. Finally, Jackson claims that his convictions under § 1346 violated the *ex post facto* clause of the Constitution. We will discuss each issue in turn.

(1) *Independent Duty*

The Paradies defendants argue that because the Paradies companies had no legal duty to anyone to prevent Jackson's scheme from succeeding, then they cannot be held liable for aiding and abetting him in that scheme. The defendants rely heavily on *Dirks v. S.E.C.,* 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983), and *Chiarella v. United States,* 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980), wherein the Supreme Court found that a defendant cannot be convicted for securities fraud (*Dirks* ), or for aiding and abetting securities fraud (*Chiarella* ), unless he breached a legal duty. Because the Paradies companies claim that they merely made routine, lawful fee and dividend payments to Hartsfield Concessions and had no independent duty to disclose anything about their shareholder's fraudulent scheme, they cannot

be convicted for helping Jackson in that scheme. They contend that "without access to the opinion of the Ethics Board, the Paradies defendants were lulled into a false sense of security that there was nothing inherently improper about the relationship between Wilbourn and Jackson." The government readily admits that the Paradies defendants were not fiduciaries to the City. They claim, however, that this circuit does not require that an independent duty exist in order to be convicted of aiding and abetting in a mail fraud scheme.

This court has addressed this issue in a recent case, *United States v. Waymer,* 55 F.3d 564, 568 (11th Cir.1995), *cert. denied,* --- U.S. ----, 116 S.Ct. 1350, 134 L.Ed.2d 519 (1996). In *Waymer,* the defendant was a member of the Atlanta Board of Education, and he used his status to award service contracts to certain companies in return for monetary benefits. Waymer was convicted of mail fraud, because he mailed payments to the contractors for the services they rendered. He contended that because the school system had a legal obligation to make those payments, the mailing of the checks to pay a legal debt could not provide a basis on which to satisfy the mailing requirement of § 1341. In upholding his conviction, this court relied on *Schmuck v. United States,* 489 U.S. 705, 710, 109 S.Ct. 1443, 1447, 103 L.Ed.2d 734 (1989), wherein the Supreme Court found that mailings that furthered the overall scheme to defraud would satisfy the mailing requirement of § 1341, even though the mailings may have been otherwise legal. The *Waymer* court found that it was presented with an even stronger case than in *Schmuck,* because the checks mailed to the contractor

were the very source of the illegal payments to Waymer; if the contractors did not get paid, neither did Waymer.[29] *Waymer,* 55 F.3d at 570.

Although the Paradies companies routinely mailed out fee and dividend checks, the government showed that those payments were made in exchange for Jackson's political influence. Under the reasoning in *Waymer,* those mailings can serve as the basis for a conviction under § 1341. Additionally, the Paradies defendants do not cite to one mail fraud case to support their theory that an independent duty *must* exist between the defendant and the victim. This court stated in *Waymer* that "[a] defendant's breach of a fiduciary duty *may be* a predicate for a violation of the mail fraud statute where the breach entails the violation of a duty to disclose material information." *Id.* at 571 (emphasis added). That predicate is inapplicable to the facts of this case, however, because the Paradies defendants were not charged with a failure to disclose a material fact; they were charged with aiding and abetting by *actively participating* in the crime. Jackson certainly had a fiduciary duty to the City. Using the mails to deliver dividend checks and fees, if intentionally designed as a payoff to Jackson, is clearly sufficient to convict the Paradies defendants for aiding and abetting the fraud under § 1346.

(2) *Vagueness*

The Paradies defendants also argue that § 1346, which brings

---

[29]Furthermore, the *Waymer* court also held specifically that the required element of " "mailing' ... need not be an essential element of the scheme." *Waymer,* 55 F.3d at 569 (citing *Schmuck,* 489 U.S. at 710, 109 S.Ct. at 1447).

schemes to defraud another of the intangible right of honest services, is unconstitutionally vague. Whether a statute is vague is a question of law to be reviewed *de novo*. *Dodger's Bar & Grill, Inc. v. Johnson County Bd. of County Comm'rs*, 32 F.3d 1436, 1443 (10th Cir.1994).

This question was also addressed by the *Waymer* court, and it rejected the same challenge on strikingly similar facts. First, the court reasoned that "[a] statute is not unconstitutionally vague if it "define[s] the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.' " *Waymer*, 55 F.3d at 568 (quoting *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983)). It should be plain to ordinary people that offering and accepting large sums of money in return for a city councilman's vote is the type of conduct prohibited by the language of § 1346.[30] This is a specific intent crime, and the jury was

---

[30]The contentions of defendants who claim that it is unclear whether their conduct is covered by § 1346 have a hollow ring, because until the Supreme Court's decision in *McNally v. United States,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), federal courts had uniformly construed the mail fraud statute to cover the situation where public officials received bribes and kickbacks thereby depriving the citizenry of their "intangible rights" to good and honest government. *See, e.g., United States v. Holzer,* 816 F.2d 304 (7th Cir.), *rev'd,* 828 F.2d 21 (7th Cir.1987), *cert. denied,* 484 U.S. 1076, 108 S.Ct. 1054, 98 L.Ed.2d 1016 (1988); *United States v. Silvano,* 812 F.2d 754 (1st Cir.1987); *United States v. Clapps,* 732 F.2d 1148 (3d Cir.), *cert. denied,* 469 U.S. 1085, 105 S.Ct. 589, 83 L.Ed.2d 699 (1984); *United States v. Barber,* 668 F.2d 778 (4th Cir.), *cert. denied,* 459 U.S. 829, 103 S.Ct. 66, 74 L.Ed.2d 67 (1982); *United States v. Margiotta,* 688 F.2d 108 (2d Cir.1982), *cert. denied,* 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983); *United States v. Diggs,* 613 F.2d 988 (D.C.Cir.1979), *cert. denied,* 446 S.Ct. 982, 100 S.Ct. 2961, 64 L.Ed.2d 838 (1980); *United States*

properly instructed on that intent.  *See* discussion, *infra,* at pp. 3672-74.  Additionally, the evidence was overwhelming that these defendants "intended to defraud the citizens of Atlanta of [Jackson's] honest services."  *Id.* at 569.  Therefore, the vagueness challenge must fail.

We acknowledge that a recent Fifth Circuit decision, *United States v. Brumley,* 79 F.3d 1430 (5th Cir.1996), may indicate to the contrary.  We agree, however, with the views of the dissenting opinion by Judge Harlington Wood, Jr.:

> By enacting § 1346, Congress expressly extended the reach of the wire fraud statute to "include[ ] a scheme or artifice to deprive another of the intangible right of honest services."  I agree with the majority that the term "another" should be given its ordinary meaning and that the most common usage of "another" as a pronoun is "an additional one" or "one more."  Under my ordinary reading of § 1346, however, "another" can easily be read to refer to a state citizen where the perpetrator of the fraud is a governmental official acting in his or her official capacity.

*Brumley,* 79 F.3d at 1452.  This circuit in *Waymer* has so held and the Fourth Circuit has agreed with that rationale in *United States v. Bryan,* 58 F.3d 933 (4th Cir.1995).  *See also United States v. Martinez,* 905 F.2d 709, 715 (3d Cir.), *cert. denied,* 498 U.S. 1017,

---

*v. States,* 488 F.2d 761 (8th Cir.1973), *cert. denied,* 417 U.S. 909, 94 S.Ct. 2605, 41 L.Ed.2d 212 (1974); *Shushan v. United States,* 117 F.2d 110 (5th Cir.1941), *cert. denied,* 313 U.S. 574, 61 S.Ct. 1085, 1086, 85 L.Ed. 1531, 1532 (1941); *see also, United States v. McNally,* 790 F.2d 1290 (6th Cir.1986) (per curiam).  According to the dissent in *McNally,* the Supreme Court decision reversed "the accumulated wisdom of many distinguished federal judges who have thoughtfully considered and correctly answered" the "intangible rights" questions as did the Sixth Circuit, which was reversed.  *McNally,* 483 U.S. at 376, 107 S.Ct. at 2890.  Government officials, including defendant Jackson, were on notice, then, until June 24, 1987, the date of the *McNally* decision—and after November 18, 1988—that such intentional actions as are charged in the indictment now at issue were deemed illegal under the mail fraud statute.

111 S.Ct. 591, 112 L.Ed.2d 595 (1990), for a further observation that "Congress' purpose in enacting § 1346 was to restore the mail fraud statute to its pre-*McNally* position by allowing mail fraud convictions to be predicated on deprivations of honest services."[31]

The Paradies defendants claim that even if § 1346 is not vague as a matter of law, they were entitled to a "fair warning" instruction to allow the jury to make the determination regarding vagueness. They requested that the court ask the jury whether the terms of the statute were "so vague that men of common intelligence" in the position of the Paradies defendants would have had fair warning of a change in the law and that they were prohibited from paying dividends or management fees to Hartsfield Concessions after the effective date of the statute. The court rejected that request, deciding the vagueness issue as a matter of law. We agree that the issue of whether a statute is void for vagueness is a question of law for the court to determine. *See, e.g., Dodger's Bar & Grill, Inc.,* 32 F.3d at 1443; *United States v. Nevers,* 7 F.3d 59, 61 (5th Cir.1993), *cert. denied,* 510 U.S.

---

[31]*See also* the legislative history comments of Representative Conyers in 134 Cong.Rec. H11, 108-01 (daily ed. Oct. 21, 1988), *quoted in Brumley,* 79 F.3d at 1436:

> This amendment restores the mail fraud provision to where that provision was before the *McNally* decision....
>
> The amendment adds a new section to 18 U.S.C. 63 that defines the term "scheme or artifice to defraud to include a scheme or artifice to defraud another of the intangible right of honest services." Thus, it is no longer necessary to determine whether or not the scheme or artifice to defraud involved money or property. This amendment is intended merely to overturn the *McNally* decision.

1139, 114 S.Ct. 1124, 127 L.Ed.2d 432 (1994). Therefore, the Paradies defendants were not entitled to a "fair warning" instruction to the jury.

(3) *The Ex Post Facto Clause*

Jackson claims that his convictions pursuant to § 1346 violated his rights under the *ex post facto* clause of the Constitution, because the crimes for which he was convicted were committed prior to the effective date of § 1346 (November 18, 1988), a time when the mail fraud statute (§ 1341) applied only to fraudulent schemes that deprived individuals of property rights, not intangible rights.[32] *See McNally v. United States,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), discussed *supra* at note 30. We find this argument to be meritless. There was sufficient evidence upon which the jury could have found that Jackson's fraudulent scheme began in 1985 but continued until the end of his tenure as a councilman (1990). In the *ex post facto* analysis, "[t]he critical question is whether the law changes the legal consequences of acts *completed* before its effective date." *Weaver v. Graham,* 450 U.S. 24, 31, 101 S.Ct. 960, 965, 67 L.Ed.2d 17 (1981) (emphasis added). Several circuits have upheld convictions under similar circumstances. *See United States v. Garfinkel,* 29 F.3d 1253, 1259-60 (8th Cir.1994) (upholding conviction under § 1346 when scheme began in 1986 and continued through 1989); *United States v. Hammen,* 977 F.2d 379, 385 (7th Cir.1992) (upholding conviction under § 1346 when bank fraud scheme spanned effective

---

[32]It is undisputed that each of the mailings that served as a basis for Jackson's convictions were mailed after November 18, 1988, the effective date of the statute.

date of the statute); *United States v. Alkins,* 925 F.2d 541, 549 (2d Cir.1991) (convictions for mail fraud upheld because defendants permitted the mailings to occur after the effective date of the statute). Accordingly, Jackson's mail fraud convictions for conduct that continued *after* the effective date of § 1346 do not violate the *ex post facto* clause.

## C. Jury Instructions

The Paradies defendants claim that the district court erred in instructing the jury on "specific intent" and in failing to give the "theory of the defense" instruction that it proposed at trial. We will address those issues separately.

### (1) *Specific Intent*

The Paradies defendants first argue that the district court erred in charging the jury on specific intent, because it failed to require the jury to find that the defendants knew that their conduct was against the law, and that "ignorance of the law" is a valid defense because mail fraud is a specific intent crime. The court refused to instruct the jury in this fashion and, instead, instructed the jury that the defendants must have had the specific intent *to defraud,* rather than an intent to violate the law. Again, the Paradies defendants do not cite one mail fraud case to support their position. Instead, they cite to precedent that supports the general proposition that ignorance of the law may be a defense to a specific intent crime. *See Ratzlaf v. United States,* 510 U.S. 135, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994) (antistructuring law); *United States v. Schilleci,* 545 F.2d 519 (5th Cir.1977) (wire fraud conspiracy); *United States v. Davis,*

583 F.2d 190 (5th Cir.1978) (conspiracy to export).

While mail fraud can be classified as a "specific intent" crime, it is clear from a review of the pertinent case law that the defendants' contention is unfounded. In mail fraud cases, the government need only prove that the defendant had the intent to deceive, and ignorance of the law is no defense. *See Waymer,* 55 F.3d at 568 (defendant need only show the "specific intent to defraud"); *United States v. Hooshmand,* 931 F.2d 725, 731 (11th Cir.1991) (intentional participation in a scheme to defraud); *Pelletier v. Zweifel,* 921 F.2d 1465, 1499 (11th Cir.) ("conscious knowing intent to defraud"), *cert. denied,* 502 U.S. 855, 112 S.Ct. 167, 116 L.Ed.2d 131 (1991); *United States v. Williams,* 728 F.2d 1402, 1404 (11th Cir.1984) (specific intent to defraud); *United States v. O'Malley,* 707 F.2d 1240, 1247 (11th Cir.1983) (same). The Second Circuit stated specifically, "The specific intent required under the mail fraud statute is the intent to defraud, ... and not the intent to violate a statute." *United States v. Porcelli,* 865 F.2d 1352, 1358 (2d Cir.), *cert. denied,* 493 U.S. 810, 110 S.Ct. 53, 107 L.Ed.2d 22 (1989). Also, the Tenth Circuit has specifically held under similar circumstances that the district court did not err in instructing the jury that "every person is presumed to know what the law forbids." *United States v. Hollis,* 971 F.2d 1441, 1451-52 (10th Cir.1992), *cert. denied,* 507 U.S. 985, 113 S.Ct. 1580, 123 L.Ed.2d 148 (1993). In light of the foregoing, we must reject the Paradies defendants' argument on this point.

Next, they argue that the court gave, in substance, a general intent instruction rather than a specific intent instruction. The

district court instructed the jury as follows:

> Now, fraudulent intent is necessary to sustain a charge of a scheme to defraud.
>
> Now, in that regard, intent and motive should not be confused. Motive is what prompts a person to act while intent refers to the state of mind with which the act is done.
>
> So, if you find beyond a reasonable doubt that the acts constituting the crime charged were committed by the defendant under consideration voluntarily, with a specific *intent to do something the law forbids,* then the element of "willfulness", as defined in these instructions has been satisfied *even though the defendant may have believed his conduct was* either religiously, politically, morally or otherwise *required,* or that ultimate good would result from such conduct.
>
> *On the other hand, if you have a reasonable doubt as to whether the defendant acted in good faith,* sincerely believing himself to be exempt by the law, then he did not intentionally violate a known legal duty; that is, he did not act "willfully," and that essential part of the offense has not been established.

The court reiterated the specific intent requirement in other parts of the charge. *See, e.g.,* these instructions: "What must be proved and proved beyond a reasonable doubt is that the defendant knowingly and willfully devised or intended to devise a scheme to defraud substantially the same one that is alleged in the indictment, and that the use of the United States mail was closely related to the scheme." (R48-4252). "[T]he question is, did the defendant intend to deceive and defraud?" (R48-4252-53); "Now, the Government must prove beyond a reasonable doubt that these [Paradies] defendants aided, abetted, counseled, or caused mail fraud to be committed with the specific intent that each and every element of the crime of mail fraud be committed by some person." (R48-4261). "Now, in this case good faith is a complete defense ... because good faith on the part of the defendants is inconsistent with the intent to defraud or willfulness, which is an

essential part of the charges."  (R48-4268).

The government claims that the above-quoted portion of the jury instructions was requested by the defendants.  Having asked for the charge, the government claims, they cannot now complain about it.  *See United States v. Chandler,* 996 F.2d 1073, 1084 (11th Cir.1993) (appellant cannot complain of a jury instruction that he submitted), *cert. denied,* --- U.S. ----, 114 S.Ct. 2724, 129 L.Ed.2d 848 (1994);  *Leverett v. Spears,* 877 F.2d 921, 924 (11th Cir.1989) (doctrine of invited error precludes appellate claim that jury instruction requested by the appellant was erroneous).  The Paradies defendants claim that the charge was not accepted as they requested it verbatim, but that they strenuously objected to the amended version given by the district court.

Assuming that the defendants are not barred from complaining about the instructions, the court must look at "the charges as a whole" to determine whether the jury was "sufficiently instructed ... so that it understood the issues involved and were not misled." *See Hooshmand,* 931 F.2d at 731.  The portions of the instructions about which the defendants complain might potentially be deemed confusing.[33]  However, after reviewing the instructions are read in their entirety, we find that they were legally sufficient, particularly in light of the other instructions pointed out by the government.  The court explained many times that the defendants must have acted with the specific "intent to defraud," which

_____

[33]For example, the last part instructs that if the jury *doubts* the defendant's *good* faith, then it should find that the defendant did not violate his duty.  It would seem that the law is the converse (*i.e.,* if you *doubt* that the defendants acted in good faith, then you should find that they violated the law.).

constituted a correct assessment of the law.[34]

(2) *Theory of Defense*

The refusal to give an instruction is reviewed for an abuse of discretion.  *United States v. Turner,* 871 F.2d 1574, 1578 (11th Cir.), *cert. denied,* 493 U.S. 997, 110 S.Ct. 552, 107 L.Ed.2d 548 (1989), and is reversible error if (1) the requested instruction was a correct statement of the law, (2) its subject matter was not substantially covered by other instructions, and (3) its subject matter dealt with an issue in the trial court that was so important that failure to give it seriously impaired the defendant's ability to defend himself.  *United States v. Sirang,* 70 F.3d 588, 593 (11th Cir.1995).

Almost three months before trial, D. Paradies submitted a requested jury charge labeled "Theory of the Defense."  The submitted charge consisted only of two introductory paragraphs, and then explained in brackets that "the remainder of this proposed charge will be submitted to the Court after the defense rests."  At some point just before the court instructed the jury, D. Paradies submitted the remainder of the proposed charge, which basically summed up the his defense theory:  that he had no duty to supervise the financial arrangements between his co-defendants;  that he had

_____

[34]The Paradies defendants claim that the evidence was insufficient to convict them of mail fraud because there was no evidence that the Paradies defendants knew of the illegal nature of the relationship between Wilbourn, Hartsfield Concessions, and Jackson.  In light of the fact that ignorance of the law is an invalid defense, and because of the overwhelming amount of evidence that showed the defendants' knowledge of and involvement in the fraudulent scheme, we reject that argument.  We do not construe *United States v. Sanchez-Corcino,* 85 F.3d 549 (11th Cir.1996), as requiring a different result on the issue of requisite intent.

no specific intent to defraud because his duty was to pay the dividends and management fees as required by the City of Atlanta's Ordinances on Minority Participation; and that there was no illegal conspiracy because his agreement with Echols had a legitimate purpose. Now D. Paradies claims that failure to give that charge was reversible error.

The district court disallowed the "revised" version of the proposed instruction because it was untimely and because "it wasn't any good anyhow." D. Paradies argues that his proposed jury charge was, in fact, timely because he filed the first proposed charge long before trial, putting the court and the government on notice. While the timeliness of this proposed jury instruction is highly suspect because the substance of it was not submitted until just before the court delivered the charges, we will assume that the instruction was timely filed and is properly reviewable by this court.[35]

Paradies argues that a defendant is entitled to a theory of defense charge for which there is any evidentiary foundation, "even

_____

[35]Fed.R.Crim.P. 30 requires the filing of written responses "[a]t the close of the evidence or at such earlier time during the trial as the court reasonably directs." The Local Rules of the court below directed the parties to file written jury instruction requests "no later than 9:30 a.m. on the date on which the case is calendared...." *See* N.D.Ga. *Local Rules* 255-2 and 525-6. Paradies did not file this instruction in accordance with the local rule, but he claims that "[t]he Local Rules cannot sensibly be read to require the pretrial submission of charges *on issues whose substance is unknown before trial.*" While the defendants claim that they did not know whether their theory of defense would be supported by the evidence, they make no persuasive argument that they did not know of the substance of their defense prior to trial. *See United States v. Johnson,* 713 F.2d 633, 652-53 (11th Cir.1983), *cert. denied,* 465 U.S. 1081, 104 S.Ct. 1447, 79 L.Ed.2d 766 (1984).

though the evidence may be weak, insufficient, inconsistent, or of doubtful credibility." *United States v. Opdahl,* 930 F.2d 1530, 1535 (11th Cir.1991) (quoting *United States v. Lively,* 803 F.2d 1124, 1126 (11th Cir.1986)). *See also United States v. Edwards,* 968 F.2d 1148, 1153 (11th Cir.1992) ("[i]t has long been established in this Circuit that it is reversible error to refuse to charge on a defense theory for which there is an evidentiary foundation and which, if believed by the jury, would be legally sufficient to render the accused innocent"), *cert. denied,* 506 U.S. 1064, 113 S.Ct. 1006, 122 L.Ed.2d 155 (1993). In determining whether the record contains any evidentiary foundation to support the charge, the evidence must be viewed in the light most favorable to the defendant. *United States v. Hedges,* 912 F.2d 1397, 1406 (11th Cir.1990); *United States v. Lewis,* 592 F.2d 1282, 1285 (5th Cir.1979). We find that the district court was correct in finding that the requested jury charge was partisan and that it aspired "to place the Paradies defendants' desired factual findings into the mouth of the court." *See United States v. Barham,* 595 F.2d 231, 245 (5th Cir.1979) (affirming district court's failure to give "theory of defense" jury instruction when "the requested instruction was more in the nature of a jury argument than a charge"), *cert. denied,* 450 U.S. 1002, 101 S.Ct. 1711, 68 L.Ed.2d 205 (1981); see also *United States v. Silverman,* 745 F.2d 1386, 1399-1400 (11th Cir.1984) (affirming district court's refusal to give "theory of defense" argument because the instruction merely emphasized a certain phase of the evidence). Also, the proposed instruction included legal theories which we have rejected *supra*

(*e.g.,* the "duty" theory, the "ignorance of the law" defense).
Indeed, a charge must have "legal support" as well as foundation in
the evidence. *United States v. Morris,* 20 F.3d 1111, 1115 (11th
Cir.1994) (finding that a defendant is entitled to a theory of
defense instruction as long as it has legal support); *Silverman,*
745 F.2d at 1399 ("the requested instruction must be a legally
cognizable defense to the indictment"). The instructions given by
the district court fairly and adequately presented Paradies'
defense theories to the jury. *See Barham,* 595 F.2d at 245 (finding
that the instructions given adequately and fairly presented the
defendant's theory without the "theory of defense" instruction).
Therefore, we find that D. Paradies is not entitled to a reversal
based on the district court's failure to give the proposed
instruction.

*D. Propriety of the Convictions Pursuant to § 666*

D. Paradies and Jackson contest their convictions under 18
U.S.C. § 666, which criminalizes the following acts:

> [C]orruptly giv[ing], offer[ing], or agree[ing] to give
> anything of value to any person, with intent to influence or
> reward an agent of an organization or of a State, local or
> Indian tribal government, or any agency thereof, in connection
> with any business, transaction, or series of transactions of
> such organization, government, or agency involving anything of
> a value of $5000 or more.

18 U.S.C. § 666(a)(2). The statute applies, however, only where:

> the organization, government, or agency receives, in any one
> year period, benefits in excess of $10,000 under a Federal
> program involving a grant, contract, subsidy, loan, guarantee,
> insurance, or other form of Federal assistance.

18 U.S.C. § 666(b). D. Paradies argues that the district court
misconstrued § 666 *not* to require two essential elements: (1) that
the corrupt payments be made in connection with the *administration*

*of programs* receiving federal funds, and (2) that the payments be made as a "quid pro quo" for an official act. He argues that those errors led the district court impermissibly to deny his motions to dismiss, for judgment of acquittal, and for a new trial, and that they also caused the court to reject the proposed jury charges relating to those issues. Jackson relies only on the first argument, and not the "quid pro quo" argument, in support of his claim. The government, on the other hand, claims that "[t]he plain language of § 666 does not impose these limitations, nor has any court ever engrafted these limitations on the clear statutory text." We will discuss each argument in turn.

(1) *Does § 666 Require that the Corrupt Payment Be Directly Connected to the Administration of Federal Funds?*

The defendants argue that they cannot be convicted pursuant to § 666 because the corrupt payments that were the subject of those convictions were not shown to be connected to any federally funded program. They argue, relying on legislative history, that the purpose of the statute was to protect the integrity of monies distributed through federal programs. Because the corrupt transactions at issue affected only private or local monies, their conduct was not intended to be covered under § 666. In addition to legislative history, the defendants cite authority from other jurisdictions that purport to apply this restriction to crimes under § 666. *See United States v. Wyncoop,* 11 F.3d 119 (9th Cir.1993); *United States v. Coyne,* 4 F.3d 100 (2d Cir.1993), *cert. denied,* 510 U.S. 1095, 114 S.Ct. 949, 127 L.Ed.2d 221 (1994); *United States v. Cicco,* 938 F.2d 441 (3d Cir.1991); and *United States v. Westmoreland,* 841 F.2d 572 (5th Cir.), *cert. denied,* 488

U.S. 820, 109 S.Ct. 62, 102 L.Ed.2d 39 (1988). The government claims, however, that "[e]very court to have considered this issue has rejected defendant's argument attempting to limit the scope of the statute." Further, it argues that *Westmoreland* actually supports its position. We agree.

First, in construing § 666, we agree with the following expression of the Fifth Circuit:

> [W]e find the relevant statutory language plain and unambiguous. By the terms of § 666, *when a local government agency receives an annual benefit of more than $10,000 under a federal assistance program, its agents are governed by the statute,* and an agent violates subsection (b) when he engages in the prohibited conduct "in *any* transaction or matter or series of transactions or matters involving $5,000 or more concerning the affairs of" the local government agency. 18 U.S.C. § 666(b) (Supp.1984) (emphasis added). Subsection (b) contains nothing to indicate that "any transaction involving $5,000" means "any federally funded transaction involving $5,000" or "any transaction involving $5,000 of federal funds," and other subsections of the statute contain no inconsistent provisions that might suggest such a qualification.

*Westmoreland,* 841 F.2d at 576 (emphasis added).

Other circuits have followed this approach and have established that the government is not required under § 666 to trace the flow of federal funds and assistance to any particular project, such as the airport concession programs. *See United States v. Bonito,* 57 F.3d 167, 172-73 (2d Cir.1995) (rejecting argument that there must be a link between the corrupt transaction and the protection of federal funds), *cert. denied,* --- U.S. ----, 116 S.Ct. 713, 133 L.Ed.2d 667 (1996); *Coyne,* 4 F.3d at 108-09 (stating that the plain language of § 666 "neither explicitly nor implicitly requires that the $10,000 be directly linked to the program that was the subject of the bribe"); *United States v.*

*Simas,* 937 F.2d 459 (9th Cir.1991) ("The broad language of [§ 666] does not require a tracing of federal funds to the project affected by the bribe."). Furthermore, the plain language of the statute merely requires that the payments be made to an agent of the State which "receives benefits in excess of $10,000 in any one year period." Because the language in the statute is clear, it would be improper to look to the legislative history for clarification. *Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 254, 112 S.Ct. 1146, 1149-50, 117 L.Ed.2d 391 (1992). We find the cases cited by defendants to be distinguishable or inapplicable.[36] Accordingly, we decline the invitation to include the suggested "connection to federal funds" element as a requirement to convictions under § 666.

(2) *Does § 666 Require a Quid Pro Quo?*

A quid pro quo is simply a specific official act in exchange for a specific corrupt payment. D. Paradies claims that this element is required in order to convict him under § 666, as is evidenced by the amendment of § 666, and that the district court erred in failing to give an appropriate jury charge to that effect. Further, he argues that the government did not produce evidence that the 1990 reimbursement to Echols was connected in any way to an official act or benefit.

The government claims that, because this is the appeal from the district court's failure to give a "quid pro quo" jury charge, and the defendant neither requested nor objected to the absence

---

[36]*United States v. Cicco,* 938 F.2d 441, 444 (3d Cir.1991) (finding that the test of § 666 is ambiguous); *United States v. Wyncoop,* 11 F.3d 119, 121-23 (9th Cir.1993) (discussing whether § 666 applies to employees of entities that receive only indirect benefits from a federal program).

thereof, this court reviews this issue for plain error. Fed.R.Crim.P. 52(b). Specifically, the government argues that, even in jurisdictions that require a quid pro quo, jury instructions that merely track the language of the statute is not error. The court in *United States v. Medley,* 913 F.2d 1248, 1260 (7th Cir.1990), *cert. denied,* 510 U.S. 1013, 114 S.Ct. 604, 126 L.Ed.2d 569 (1993), stated that "[t]he essential element of a § 666 violation is a "quid pro quo[.]" The court opined, however, that the defendant did not object to the jury instructions given in the district court, which instructions "set forth the offense using the language in the body of § 666." *Id.* at 1259. In light of that fact, the instructions did not constitute error.

We have carefully reviewed the jury charges given in this case, and we are persuaded that the district court did not commit reversible error under the reasoning in *Medley.* The jury charges tracked the statutory requirements, and the evidence at trial was sufficient for a jury to find that Jackson accepted payments for his votes and his influence upon the City Council and the administration. Such a finding would satisfy any quid pro quo requirement under the statute. Therefore, the court's instructions were not plainly erroneous, and they would not serve as a basis for reversal under these circumstances.

*E. Evidentiary Issues*

The Paradies defendants also raise numerous evidentiary issues.[37] Particularly, they claim that the district court abused

---

[37]Generally, all of the defendants argue that the government's trial evidence was insufficient to convict them on various counts. In reviewing that claim, we have examined the

its discretion in excluding certain testimony of their legal expert, in admitting a tape recording of a payoff to Echols, and in admitting evidence against D. Paradies under Rule 404(b). We have carefully considered those arguments and, as is explained below, we find that the district court did not abuse its discretion in any respect.

(1) *Limitation of Testimony of Legal Expert*

The district court's exclusion of expert testimony is subject to an abuse of discretion standard, *United States v. Lankford,* 955 F.2d 1545, 1550 (11th Cir.1992), and constitutes reversible error if the defendant establishes that the error had a "substantial impact on the outcome." *United States v. Sellers,* 906 F.2d 597, 601 (11th Cir.1990).

The Paradies defendants called Thomas O. Marshall, a former Chief Justice of the Georgia Supreme Court, to testify as a legal expert. He testified about the City's MBE program and the management and shareholder's agreements. The district court refused to allow Judge Marshall to testify about the enactment of § 1346 and how it changed the law. The Paradies defendants objected, claiming that this witness would support their defenses

---

evidence in the light most favorable to the government to determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *see United States v. Dynalectric Co.,* 859 F.2d 1559, 1574 (11th Cir.1988). Using that standard, we have evaluated this evidence *de novo* in order to determine whether the district court erred in denying the defendants' motions for acquittal. *See United States v. Busacca,* 936 F.2d 232, 239 (6th Cir.), *cert. denied,* 502 U.S. 985, 112 S.Ct. 595, 116 L.Ed.2d 619 (1991). After a thorough review of the record in this case, we reject all of the defendants' "sufficiency of the evidence" contentions.

of ignorance of the law and lack of fair notice as an element of the vagueness defense.  He would have testified that a reasonable man would not have been put on notice that § 1346 precluded the Paradies defendants from making the payments to Jackson, even if Paradies knew that the arrangement between Wilbourn and Jackson was illegitimate.  *United States v. Garber,* 607 F.2d 92 (5th Cir.1979) (reversing conviction because trial court did not allow expert legal testimony on tax laws).

While *Garber* may be the law for tax cases, ignorance of the law is not a defense in this mail fraud case, as we have already discussed *supra.  See Hollis,* 971 F.2d at 1451-52.  If the district court had allowed testimony that ignorance of the law was a defense would have mislead and confused the jury.  "The law would be in a curious state if jurors received their instructions on the law from an expert witness as well from the trial judge."  *United States v. Brodie,* 858 F.2d 492, 497 (9th Cir.1988) (rejecting proffer of an expert to testify on unsettled points of law).  Additionally, as we have concluded, § 1346 is not vague under these circumstances as a matter of law, and testimony regarding that issue was properly excluded.  The district court, indeed, gave witness Marshall a broad scope of opinion testimony over objections of the government.  Accordingly, it was not an abuse of discretion for the district court to limit that testimony.

(2) *Admission of Tape Recorded Payoffs*

After he began to cooperate with the government, Echols agreed to be videotaped and audiotaped at breakfast/bribery meetings held between Echols and two other councilmembers, Arrington and Fowlkes.

The tapes show the councilmembers accepting bribes, and they also contain statements by Mr. Echols about Paradies' decision not to testify before the grand jury. Govt. Exhibit 473T ("They wanted to talk to Paradies, and at that time Paradies' attorney wouldn't let Paradies go down."). Paradies filed a motion in limine to exclude the tapes because they constituted hearsay, and they were irrelevant and prejudicial. The district court disallowed the tapes in the governments case-in-chief because they were irrelevant and unduly prejudicial. He reserved final determination on the matter, however, because the only basis for admission of the tapes would have been to rehabilitate Echols' credibility.

After Echols testified on direct at trial, the defense conducted an aggressive cross-examination of Echols. On redirect, to rehabilitate their witness, the government again sought to introduce the tapes. The district court found that the tapes were admissible under Fed.R.Evid. 801(d)(1)(B), which states that a statement is not hearsay if it is a prior consistent statement of a witness that is used to rebut an implied charge of recent fabrication.[38] On appeal, the parties agree that the admission of the tapes under this rule was error, because the Supreme Court has recently decided that the prior consistent statement under the rule must have been made *before* the alleged influence or motivation to fabricate arose. *Tome v. United States,* --- U.S. ----, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995). In this case, the government made the

---

[38]This rule is not a hearsay exception—it is a rule defining a statement that is not hearsay.

tapes after Echols' agreement to cooperate with the government.[39] Therefore, under *Tome,* the tapes would not constitute nonhearsay under 801(d)(1)(B), and the district court erred in so finding.

The government correctly argues, however, that "[r]egardless of the ground for admission of evidence cited by the district court, this Court will uphold the admission even if the district court's reasons were erroneous if the admission was proper on other grounds." *United States v. Cardenas,* 895 F.2d 1338, 1345 (11th Cir.1990). The government also correctly points out that the tapes were not hearsay, because they were not statements offered for the truth of the matter asserted. Rather, the breakfast conversations were innocuous, and they were offered merely to rehabilitate Echols' testimony that the people involved had a familiar relationship and had regular breakfast meetings.[40] *See United States v. Price,* 792 F.2d 994, 996-97 (11th Cir.1986) (statements admitted simply to put other statements into context are not hearsay). Also, there are no nonverbal hearsay concerns with the videotape of money being passed, because "[w]hen non-verbal conduct, like the transfer of money, is ambiguous, contemporaneous words which characterize the transactions are not hearsay." *United States v. Valentine,* 644 F.Supp. 818, 821 (S.D.N.Y.1986).

---

[39]His agreement with the government is presumably the basis for his motivation to fabricate his testimony.

[40]The innocuous nature of the conversations was one reason the district court initially disallowed the evidence as irrelevant. For example, although Echols made a statement about the government wanting to talk to Paradies, the government was not attempting to show that "the government wanted to talk to Paradies." They wanted to show that Echols was not lying when he testified to having a familiar relationship with the councilman and had regular breakfast meetings with him.

Therefore, because the video and audio tapes became relevant to rehabilitate Echols, and because the tapes did not constitute hearsay, the admission of the evidence was proper despite the court's erroneous ruling.

(3) *Admission of Evidence Pursuant to 404(b)*

"This court reviews the decision to admit extrinsic act evidence under Fed.R.Evid. 404(b)[41] for "clear abuse of discretion.' " *United States v. Hooshmand,* 931 F.2d 725, 736 (11th Cir.1991). The government must show that "(1) the evidence is relevant to an issue other than the defendant's character and (2) the probative value outweighs any prejudicial effect." *Id.* Also, the "evidence is admissible only if the jury could reasonably find by a preponderance of the evidence that the defendant committed the extrinsic act." *Id.*

The district court admitted two days and seven witnesses regarding evidence that the Paradies defendants violated the Michigan Campaign Finance Act ("MCFA") from 1990 through 1993 by illegally reimbursing employees for contributions to political candidates and concealing those reimbursements through phony travel vouchers. D. Paradies claims that the jury could not reasonably find that he was involved in the extrinsic acts. He takes issue with the illicit intent attached to the evidence, because he claims that there was no evidence that the actions of his companies

---

[41]Fed.R.Evid. 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident...."

violated any laws. He claims that there is no basis for 404(b) evidence when the extrinsic act involved legal activity. *Id.* The government contends that the evidence was sufficient to find that Mr. Paradies was involved in his companies' illegal contributions that violated the MCFA. We agree with the government on this point, in light of the overwhelming evidence regarding the high degree of control D. Paradies had over his companies and the intricacy of the reimbursement plan. Specifically, the evidence showed that on two travel vouchers, the annotation "Per Dan" was included next to a dinner expense for which there was no dinner. Also, the evidence showed that Mr. Paradies was active in attempting to influence, or "lobby," decisionmakers for the benefit of his companies. The jury could infer from this evidence that Mr. Paradies was involved in the clandestine scheme to contribute to political campaigns and influence those in political office who could control his airport operations.

*F. Jackson's Sentence Pursuant to the Sentencing Guidelines*

Defendant Jackson raises several objections to the applications of the sentencing guidelines to his sentence. Review of the district court's determination that Jackson's sentence should have been enhanced under U.S.S.G. §§ 2F1.1, 3C1.1, and 2T1.1 is subject to a clearly erroneous standard of review. *See United States v. Cannon,* 41 F.3d 1462, 1467 (11th Cir.) (§ 2F1.1), *cert. denied,* --- U.S. ----, 116 S.Ct. 86, 133 L.Ed.2d 44 (1995); *United States v. Jones,* 32 F.3d 1512, 1519 (11th Cir.1994) (§ 3C1.1). The district court's determination that the specific offense characteristic in U.S.S.G. § 2C1.1(b)(2)(B) applies to the

recipient of a payment is a question of law subject to de novo review.

Jackson first claims that the district court erroneously calculated the amount of loss under the all-too-familiar U.S.S.G. § 2F1.1. The district court used $669,653.03 as the amount of "loss" involved in the fraud. Jackson claims that this amount should be reduced by $400,000, which constitutes the "loan amounts." Curiously, Jackson does not provide any factual or legal basis on which this reduction should be made. We do not think that the loss amount, which consisted of the money that Jackson received from the scheme after November 18, 1988, should be reduced by any "loan amount," because the loans involved in this case were proven to be illegitimate. Therefore, Jackson's argument is meritless.

Next, Jackson argues that the district court erred in enhancing his sentence under § 3C1.1 for committing perjury at his trial. That section provides that "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution or sentencing of the instant offense, increase the offense level by two levels." U.S.S.G. § 3C1.1. The district court made a factual finding that Jackson committed perjury during the trial in a number of instances, particularly when he denied having breakfast meetings with Harold Echols. On that basis, the district court enhanced his sentence for obstruction of justice. Defendant Jackson has failed to establish that the district court was clearly erroneous in its determination that he testified untruthfully at trial. *See Jones,* 32 F.3d at 1519 (noting that the comments to § 3C1.1 allow the

enhancement if the defendant commits perjury or provides materially false information to a judge). While Jackson claims that the district court erred because it penalized him merely for his failure to plead guilty, that was not the case. Therefore, Jackson's "obstruction of justice" challenge must fail.

The district court further found that Jackson used "sophisticated means" to impede discovery of the existence or extent of the tax offense. *See* U.S.S.G. § 2T1.1(b)(2) (allowing two-level increase if sophisticated means were used to impede discovery of a tax offense). Jackson claims that the district court erred in enhancing his sentence under this section because he claims that the evidence presented in the case did not support a finding that "sophisticated means" were used. The government argues, however, that it presented ample evidence that Jackson routinely transferred money through shell corporations, such as Options International, Inc., in an attempt to conceal his transactions. In light of the evidence presented at trial, we agree with the government and find that the district court did not clearly err in enhancing Jackson's level based on the use of "sophisticated means."

Finally, Jackson's offense level was increased under U.S.S.G. § 2C1.1, which provides that "[i]f the offense level involved more than one bribe or extortion, increase by two levels.... If the offense involved a payment for the purpose of influencing an elected official or any official holding a high level decision-making or sensitive position, increase by eight levels." U.S.S.G. § 2C1.1(b)(1) & (2)(B). Jackson claims that his sentence

should not have been enhanced under this section because he was the payee, not the payor, of the bribes. The background to that section of the guidelines directly refutes Jackson's contention, because it states that "the guideline applies to a public official who solicits *or accepts* such a bribe." In light of this background statement and in the absence of any case law to the contrary, Jackson's contention must be rejected.

### III. *CONCLUSION*

In sum, we conclude that the district court did not commit reversible error in connection with any of the convictions or sentences of these defendants. We repeat the irony in this case that the thirty-five percent minority participation requirement imposed by Dobbs,[42] which was designed to benefit minority-owned businesses, served as the underlying vehicle by which Jackson became involved with the Paradies defendants. In any event, these parties received a fair trial, and the jury returned a reasonable verdict. Accordingly, we hereby AFFIRM the district court in all respects.

---

[42]The City required only 20% minority participation.