**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Fred G. WHITSON, Defendant–Appellant.**

No. 96–2619.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 13, 1997.

Decided Sept. 17, 1997.

Barry Rand Elden, Chief of Appeals, William Shaver (argued), Office of the United States Attorney, Criminal Appellate Division, Chicago, IL, for Plaintiff–Appellee.

Marcia G. Shein, Richard D. Biggs (argued), Atlanta, GA, for Defendant–Appellant.

Before POSNER, Chief Judge, and ROVNER and DIANE P. WOOD, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

In the late 1980s, Fred Whitson helped the American Comtel Corporation ("Comtel") obtain a contract to install pay telephones in Veteran's Administration ("VA") Hospitals by bribing a friend at the VA. Comtel paid Whitson more than half a million dollars during 1988, 1989 and 1990 in exchange for that assistance, and the money has been sequestered in several numbered bank accounts in the Cayman Islands ever since. In 1994, Whitson pled guilty to federal charges in the District of Columbia District that related to the bribery scheme. In addition, because Whitson omitted the Comtel payments from his income tax returns for the years in which he received them, he was also charged in the Northern District of Illinois with income tax evasion under 26 U.S.C. § 7201. Whitson pled guilty to evading income taxes in 1989, but acknowledged as part of his plea that he had underreported his income in all three years. After a lengthy evidentiary hearing, the district court sentenced Whitson under the United States Sentencing Guidelines to 18 months of imprisonment, and Whitson now appeals that sentence on several grounds. His arguments fail, and we affirm.

## I. Background

Whitson was employed by the Keebler Company for 39 years, and held the position of government accounts manager between 1988 and 1990. In that capacity, he worked with various government agencies to whom Keebler provided food products and services, including the Veterans' Administration. Whitson thereby became acquainted with Veterans' Canteen Service ("VCS") Director Robert Mantica, who was in charge of negotiating contracts on behalf of VCS. Whitson also was acquainted with Robert Hancock, the president of Comtel. Whitson told Hancock that he could help Comtel acquire a contract for the installation of public telephones in VA facilities by way of his contacts at the agency. Between 1988 and 1990, Whitson received over $800,000 from Comtel in exchange for this intercession, and he paid $27,859 in bribes to Mantica.

At Whitson's direction, Hancock deposited the Comtel payments directly into the bank accounts of three corporations, all controlled by Whitson and his associates, Roy Kelly and Bob Knox. These included two domestic corporations, FDW Enterprises and Hospitality Telecom Corporation, and the Renton Corporation, which was located in the Cayman Islands. In all, Hancock wrote 37 checks totaling $813,000 to the various corporations during the three year period. Following various paths, $513,484 of the money ultimately found its way into one of two numbered Cayman Island bank accounts. These included a personal account of Whitson, into

which $415,284.04 was deposited, and an account of the Renton Corporation (shown also to be in Whitson's exclusive control), which received $98,200.

An important question at Whitson's sentencing was how much of the money in the Cayman accounts could properly be considered to be Whitson's income.[1] Whitson argued that half of the $513,484 had been promised to Mantica in exchange for his participation in the scheme, so that only half of the money actually belonged to Whitson. The government argued that Whitson did not intend to pay Mantica more than the $27,859 he had already received, and that the full amount therefore belonged to Whitson. At the sentencing hearing, each side produced evidence in support of its theory.

Robert Mantica testified on behalf of the government, providing the following account. Mantica worked with Whitson for twenty years, and during that time the two became close friends. Mantica's involvement in the scheme began when Whitson told him that he knew of a company, Comtel, that could provide pay telephone service to the VCS hospitals. Whitson put Mantica in touch with Hancock, and the two negotiated a one-year contract for Comtel to install pay telephones in several VCS hospitals. Shortly after that contract was executed, Whitson told Mantica that he was working as a consultant for Comtel and asked if Mantica could provide him with a list of all pay telephones in VCS facilities. Whitson later offered Mantica money in exchange for that help, and Mantica accepted it. Between June and September 1989, Whitson made six payments to Mantica, totaling $27,850. Mantica testified that no additional funds had been paid or promised to him in exchange for his assistance.

In further support of its position that none of the $513,484 in the Cayman Islands accounts was earmarked for Mantica, the government introduced a letter that had been found on Whitson's home computer. The letter was addressed to Whitson's son and was meant to be read in case of Whitson's

death. In the letter, Whitson directed his son to use the funds in the Cayman Islands accounts to take care of Whitson's wife. The letter did not mention that any portion of the funds was owed to Mantica. The government also introduced evidence that in 1994, Whitson, Mantica and Hancock had faced various criminal charges in the District of Columbia District relating to the bribery scheme. In their guilty pleas in that case, Whitson and Mantica admitted to having paid and received bribes totaling $27,850. No mention was made of any further funds being owed to Mantica.

Whitson's own testimony supported his contention that half of the funds found in the Cayman Island accounts actually belonged to Mantica. Initially consistent with Mantica's version, Whitson's testimony differed as to what transpired after Mantica provided Whitson with the list of pay telephone locations in VCS hospitals. Whitson testified that he offered to split the profits with Mantica in exchange for his assistance and that he told Mantica half of the Comtel funds were being kept for him in the Cayman Islands. Whitson also offered into evidence a chart that he allegedly had created in 1993, which showed the intended fate of the funds in the Cayman accounts and indicated that half were to go to Mantica. Whitson did not produce this chart in response to the government's 1993 documents subpoena, however, but first introduced it after pleading guilty in this case. He claimed that he previously had forgotten about the chart because it was stored in a safe deposit box.

Choosing to credit the government's evidence over that of Whitson, the district court found that Whitson had exclusive control over the funds in the Renton account as well as the personal account, and that he failed to report a total of $513,484 in income for the tax years 1988, 1989 and 1990. The court therefore held Whitson responsible for the full tax deficiency, calculated at $146,253. Under Guidelines section 2T1.1(a) and 2T4.1(H), that amount produced a base of-

---

1. At his guilty plea hearing, Whitson admitted only that at least $60,000 of the unreported funds in the Cayman accounts belonged personally to him. (Sept. 26, 1995 Tr. at 33–34.)

fense level of 13.[2] In addition, the district court found that Whitson had used sophisticated means to hide his scheme and therefore qualified for a two-level enhancement under Guidelines section 2T1.1(b)(2). Finally, because of its finding that Whitson had testified untruthfully at the sentencing hearing, the district court did not grant Whitson a reduction for acceptance of responsibility under Guidelines section 3E1.1, notwithstanding his guilty plea. The district court therefore assigned Whitson an adjusted offense level of 15. In combination with his criminal history category of "I," Whitson's sentencing range was 18 to 24 months, and the court sentenced him at the bottom of that range to 18 months of incarceration.

## II. Tax Loss

■ Under Guidelines section 2T1.1, which applies to tax evasion, the defendant's offense level is based on the amount of "tax loss." U.S.S.G. § 2T1.1(a). The "tax loss" is defined as "the greater of: (A) the total amount of tax that the taxpayer evaded or attempted to evade; and (B) the 'tax loss' defined in § 2T1.3," which directs a calculation of "28 percent of the amount by which the greater of gross income and taxable income was understated, plus 100 percent of the total amount of any false credits claimed against tax." U.S.S.G. §§ 2T1.1, 2T1.3(a). Whitson does not challenge the district court's calculation of tax loss per se, but argues that in making its calculation, the district court should not have considered the full $513,484 to be Whitson's income, when half of that amount actually belonged to Mantica.

■ We review the findings of fact that underlie the district court's determination of taxable income for clear error. *United States v. Bhagavan,* 116 F.3d 189, 191 (7th Cir.1997). Like any other factual finding in the sentencing context, the district court's determination must be affirmed so long as it

is supported by a preponderance of the evidence. *United States v. Hopson,* 18 F.3d 465, 467 (7th Cir.), *cert. denied,* 512 U.S. 1243, 114 S.Ct. 2759, 129 L.Ed.2d 874 (1994); *United States v. Chandler,* 12 F.3d 1427, 1434 (7th Cir.1994). Here, the district court reviewed conflicting evidence regarding the funds in the Cayman accounts, including inconsistent testimony from Whitson and Mantica. Although Whitson contended that half of the money belonged to Mantica, Mantica testified that he was meant to receive no more than the $27,859 that Whitson had already paid him. Mantica's version was also supported by the letter that Whitson had written to his son about the Cayman accounts and the pleas in the District of Columbia case. The district court was explicit at Whitson's sentencing that the question boiled down to a credibility determination and that it was choosing to credit Mantica's testimony over that of Whitson. The court explained:

> And so it comes down to a finding of credibility, based on credibility. And very frankly, I do not find Mr. Whitson to be a credible witness based on his testimony. His story just doesn't hold together.

> *       *       *

> But it seems to me that the note to his son says very clearly in Mr. Whitson's own words, in a document that he never believed would see the light of day, that he intended that money to be for him and his family when he died. It totally contradicts the defense position on that point.

(June 21, 1996 Tr. at 7–8.) The court also chose not to credit the tardily submitted document prepared by Whitson suggesting that more of the funds were intended for Mantica. (June 21, 1996 Tr. at 8.) The district court's determination that the full $513,484 in the Cayman accounts belonged to Whitson was therefore based on a clearly articulated credibility determination and was supported by a preponderance of the evidence. It was not clearly erroneous.[3]

---

**2.** The court used the 1990 Guidelines edition in sentencing Whitson because it was in effect at the time of his offense and it contained a "tax table," section 2T4.1, that was more beneficial to Whitson.

**3.** Whitson raises two additional arguments relating to the court's reliance on the full $513,484 in calculating his tax loss, but both have been waived. The first theory, that Whitson did not exercise sufficient control over the funds for them to be considered his income, was not raised

## III. Sophisticated Means

■ Whitson next argues that the district court erred when it increased his offense level by two under Guidelines section 2T1.1(b)(2), which provides for the enhancement "[i]f sophisticated means were used to impede discovery of the nature or extent of the offense[.]" We review this fact-based finding for clear error. *United States v. Madoch,* 108 F.3d 761, 765 (7th Cir.1997); *United States v. Hammes,* 3 F.3d 1081, 1083 (7th Cir.1993). Here, the district court had direct guidance in determining whether Whitson's conduct qualified for the enhancement. Application Note 6 to Guidelines section 2T1.1 provides:

> "Sophisticated means," as used in § 2T1.1(b)(2), includes conduct that is more complex or demonstrates greater intricacy or planning than a routine tax-evasion case. An enhancement would be applied for example, where the defendant used offshore bank accounts, or transactions through corporate shells.

In light of the fact that the example provided in the application note is nearly identical to Whitson's scheme, the district court found Whitson's objection to the enhancement to be "indefensible" (June 21, 1996 Tr. at 8), and we agree. The district court's determination that Whitson's conduct constituted "sophisticated means" for purposes of the guideline was supported by a preponderance of the evidence and certainly was not erroneous in light of the application note. *See also Madoch,* 108 F.3d at 765–66; *United States v. Wu,* 81 F.3d 72, 73–74 (7th Cir. 1996); *Hammes,* 3 F.3d at 1083.

## IV. Acceptance of Responsibility

■ Finally, Whitson argues that the district court erred in refusing to grant him a reduction for acceptance of responsibility under Guidelines section 3E1.1. Prior to its 1992 amendment, that guideline authorized the reduction when "the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct[.]" U.S.S.G. § 3E1.1. Although frequently granted when the defendant enters a plea of guilty, pleading guilty does not automatically entitle a defendant to receive the reduction. U.S.S.G. § 3E1.1(c); *see also United States v. Schaefer,* 107 F.3d 1280, 1289 (7th Cir.1997); *United States v. Panadero,* 7 F.3d 691, 694 (7th Cir.1993). The district court's finding regarding acceptance of responsibility is one of fact that depends primarily upon credibility assessments and is reviewed for clear error. *Schaefer,* 107 F.3d at 1289; *Panadero,* 7 F.3d at 694. Indeed, Application Note 5 to section 3E1.1 directs special deference to the district judge on this issue:

> The sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference on review.

■ Here, the district court chose to deny the reduction because of its finding that Whitson had testified untruthfully regarding his ownership of the money in the Cayman accounts. (June 21, 1996 Tr. at 8.) We have consistently upheld similar determinations when the district court finds that despite pleading guilty the defendant has denied responsibility for the full extent of his conduct. *See, e.g., Schaefer,* 107 F.3d at 1289–90; *United States v. Taylor,* 72 F.3d 533, 550–51 (7th Cir.1995); *United States v. Schuler,* 34 F.3d 457, 460–61 (7th Cir.1994). Here, although he pled guilty to tax evasion, Whitson denied responsibility for half of the income that the court ultimately determined to be his. The court's denial of the reduction for acceptance of responsibility under those circumstances was not clearly erroneous.

## V.

The district judge did not err on any of the sentencing issues that Whitson has raised on

---

before the district court. The second theory is that Whitson should not be held liable for those funds that came to the Cayman accounts by way of the FDW corporation because FDW had already paid corporate taxes on those amounts. Although this theory apparently was raised be-

fore the district court, it was waived at Whitson's sentencing. (*See* June 21, 1996 Tr. at 5–8.) Because these arguments were not pursued below, the district court made no findings relating to them.

appeal. Whitson's sentence is therefore AF-FIRMED.