[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 96-5013
_____

D.C. Docket No. 95-6067 CR-NCR


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RUSSELL G. BARAKAT,

Defendant-Appellant.


_____

Appeal from the United States District Court
for the Southern District of Florida
_____

**December 15, 1997)**


Before ANDERSON, DUBINA and CARNES, Circuit Judges.

CARNES, Circuit Judge:

A jury acquitted Russell G. Barakat of mail fraud conspiracy involving a kickback scheme but convicted him of filing a false income tax return in violation of 26 U.S.C. § 7206(1), i.e., tax evasion. At his sentencing, the district court determined that Barakat had a base offense level of eight and a criminal history category of I, which under the United States Sentencing Guidelines resulted in a sentencing range of zero to six months. However, the district court gave Barakat sentence enhancements for: (1) failing to report more than $10,000 in income from criminal activity (four levels), see U.S.S.G. § 2T1.1(b)(1); (2) using sophisticated means to impede the discovery or extent of his offense (two levels), see U.S.S.G. § 2T1.1(b)(2); and (3) abusing his position of public trust in a manner which significantly facilitated the commission or concealment of his offense (two levels), see U.S.S.G. § 3B1.3. Those three enhancements made Barakat's total offense level sixteen, resulting in a sentencing range of 21 to 27 months. The district court sentenced him to 21 months in prison.

Barakat's challenge to the tax evasion conviction is meritless and requires no discussion. However, several of his contentions involving the sentence enhancements applied in this case present novel issues. As discussed below, we conclude that the district court erred in applying two of the three sentence enhancements in this case, and a remand is necessary for clarification of that court's ruling concerning the third enhancement.

## I. FACTS

Barakat was the head of the Broward County Housing Authority ("Authority") during the late 1980's. His contract with the Authority barred him from working for clients other than the Authority, and Florida law prohibited him from holding any employment or having any contractual relationship with any entity that did business with his agency. In the event that Barakat had outside income exceeding 5 percent of his annual Authority salary, he was required to file a public disclosure statement.

During his tenure with the Authority, Barakat gained experience working with the United States Department of Housing and Urban Development ("HUD") and the Federal Housing Authority ("FHA"). He also became acquainted with Frank Daniels, an executive of the Benton Mortgage Company. Benton Mortgage financed $26,600,000 of the Authority's projects while Barakat headed the Authority. At the same time, Benton Mortgage was seeking to finance several HUD and FHA projects around the country, including projects in San Antonio and Los Angeles. In its application to the San Antonio and Los Angeles housing authorities, Benton Mortgage listed Barakat as a reference. When representatives of the Los Angeles and San Antonio authorities contacted Barakat, he gave Daniels and Benton Mortgage favorable references. Both of those housing authorities thereafter selected Benton Mortgage to help finance their projects.

Sometime after Barakat gave those favorable references for Benton Mortgage, Daniels instructed a Benton Mortgage loan

3

underwriter to pay E. Lewis Fields, an attorney, a $5,000 "referral fee." The underwriter who received those instructions had worked closely with Daniels on the San Antonio project but he had never heard of Fields and, as far as he knew, Fields had not performed any legal work on the project.

In 1990, a federal investigation began to focus on Fields' law firm. Investigators discovered that Fields had received large fees on at least two bond issues and that those fees were deposited into his firm's trust account instead of an operating account. In reviewing documents subpoenaed from Fields' law firm, investigators came across five checks that had been drawn on Fields' trust account and made payable to Barakat in 1989. The total amount of these five checks was $9,666.

The government interviewed Barakat in connection with its investigation of Fields. During his interview, Barakat told the government that in 1989 he had done some consulting work for Fields on projects "located in San Antonio . . . and Los Angeles." He had been hired, he claimed, based on his experience in dealing with HUD and FHA. After further questioning, he admitted that he had done the consulting work for Benton Mortgage and Frank Daniels, for which he had received $15,000. According to Barakat, Fields had initially received the $15,000 but the funds were thereafter split, with two-thirds going to Barakat and one-third being kept by Fields.

The government investigated Barakat's story. Bank records revealed that Benton Mortgage had written two checks to Fields.

4

The first, for $5,000, was deposited in Fields' trust account on December 30, 1988.  The second, for $10,000, was deposited in Fields' trust account on January 31, 1989. On January 10, 1989, a check drawn on Fields' trust account for $3,333 was made payable to Barakat. On February 16, 1989, Barakat received a second check, for $5,000, drawn on that account.  Later in 1989, Barakat received three additional checks from the trust account in the amounts of $700, $333, and $300. The government determined that Barakat had not reported any of the money he received from Fields' trust account  as income in 1989.

## II.  DISTRICT COURT PROCEEDINGS

Based on its investigation, the government obtained an indictment of Barakat for conspiracy to commit mail fraud and income tax evasion. The government introduced the evidence of Barakat's relationship with Benton Mortgage, the recommendations made by Barakat to the Los Angeles and San Antonio housing authorities, the suspicious payments from Benton Mortgage to Fields' trust account, and the payments from Fields' trust account to Barakat.  Apparently, the government's position was that these activities were part of an illegal "kickback" scheme, in which Barakat aided Benton Mortgage in obtaining business by using his position at the Authority in return for money.  A jury acquitted Barakat on the mail fraud conspiracy charge, but convicted him on the income tax evasion charge.

The United States Probation Office prepared a Presentence Investigation Report ("PSI") for Barakat and, in accordance with

5

the jury's verdict that the tax loss did not exceed $5,000, calculated Barakat's base offense level at eight. See U.S.S.G. § 2T1.1. The PSI recommended that Barakat receive a four-level sentence enhancement because he "failed to report or correctly identify the source of income exceeding $10,000 in any year from criminal activity." See U.S.S.G. § 2T1.1(b)(1). For that enhancement to apply, as the PSI noted, the district court would have to consider conduct pertaining to the mail fraud conspiracy charge, for which Barakat had been acquitted. The PSI recommended three additional sentence enhancements: two levels because Barakat used "sophisticated means" to impede the discovery of the existence or extent of the offense, see U.S.S.G. § 2T1.1(b)(2); two levels because Barakat was the organizer, leader, manager or supervisor of the criminal activity, see U.S.S.G. § 3B1.1(c); and two levels for Barakat's abuse of his position of public trust; see U.S.S.G. § 3B1.3. Adding these enhancements to Barakat's base offense level of eight, the PSI concluded that Barakat had a total offense level of eighteen, which corresponded to a sentencing range of twenty-seven to thirty-three months.

At his sentencing hearing, Barakat objected to the PSI on several grounds: (1) that the income he did not report was not derived from criminal activity; (2) that he did not receive more than $10,000 in any year; (3) that the government failed to establish that he had abused a position of trust; (4) that the government failed to establish that he had used sophisticated means to commit the offense of income tax evasion; and (5) that he should

6

not be given an enhancement for being "an organizer or leader" of the criminal activity.

At the sentencing hearing, IRS Special Agent Steven Musgrave, who was stipulated to be an expert on tax matters, testified that Barakat should have reported $15,000 in income rather than $9,666. Musgrave testified that the entire $15,000 was income to Barakat and that the $5,334 Barakat "paid" to Fields could not be deducted as an "ordinary and necessary expense."

The district court found that the evidence concerning the tax count and the mail fraud conspiracy count were "inextricably intertwined," because the court could not distinguish between the acquitted conduct and the conduct underlying the tax evasion count. However, the court stated that even if it did manage to separate the evidence concerning of tax evidence from the evidence of mail fraud conspiracy, it would still determine that Barakat's base offense level was twelve, because Barakat had received more than $10,000 in income from criminal activity in one year. The court found that Fields was just a "conduit," and therefore rejected Barakat's suggestion that he should not be held accountable for the full $15,000 in payments. The court also held that Barakat had used "sophisticated means" in committing the offense, and therefore deserved a two-level enhancement. However, the court rejected the PSI's recommendation that Barakat be given a two-level enhancement for being an "organizer or leader" of criminal activity. Finally, the court found that it was "rather obvious" that Barakat had abused the public trust. The court therefore determined that

Barakat's total offense level was sixteen and sentenced him to twenty-one months in prison.

## III. STANDARD OF REVIEW

We review <u>de</u> <u>novo</u> the district court's interpretation and application of the United States Sentencing Guidelines ("Sentencing Guidelines"). <u>See</u> <u>United States v. Lewis</u>, 115 F.3d 1531, 1536 (11th Cir. 1997). In the context of applying enhancements to specific offense characteristics, this Court has held that our review is <u>de</u> <u>novo</u>. <u>See</u> <u>United States v. Taylor</u>, 88 F.3d 938, 942 (11th Cir. 1996); <u>cf.</u> <u>United States v. Scroggins</u>, 880 F.2d 1204, 1206 n.5 (11th Cir. 1989)(holding that the misapplication of guidelines to undisputed facts raises a question of law subject to <u>de</u> <u>novo</u> review). However, we review the district court's factual findings related to the imposition of sentencing enhancements only for clear error. <u>See</u> <u>Lewis</u>, 115 F.3d at 1536 (citing <u>United States v. Dukovich</u>, 11 F.3d 140, 141 (11th Cir. 1994)).

## IV. DISCUSSION

Barakat challenges each of the three sentence enhancements that the district court applied, and we will discuss each one in turn.

### A. THE §2T1.1(b)(1) ENHANCEMENT FOR FAILURE TO REPORT MORE THAN $10,000 FROM CRIMINAL ACTIVITY IN ONE YEAR.

The district court found that Barakat had failed to report more than $10,000 that he received from criminal activity. Barakat contends that he did not receive the unreported income from

criminal activity. He argues that because he was acquitted of the mail fraud count, the money he received from Fields' trust account and did not report on his tax return was not income from "criminal activity." Moreover, he argues that the government failed to establish that the checks from Fields' trust account represented the proceeds of criminal activity, with the result being that the district court clearly erred in determining the money he received was obtained from criminal activity. Furthermore, he says, it would be "unfair" and violative of his Fifth Amendment Double Jeopardy and Due Process rights to consider conduct for which he was acquitted when enhancing his sentence.

### 1. Whether the Court Erred In Considering the Mail Fraud Evidence

Relevant conduct of which a defendant was acquitted nonetheless may be taken into account in sentencing for the offense of conviction, as long as the government proves the acquitted conduct relied upon by a preponderance of the evidence. See United States v. Watts, --- U.S. ----, ---, 117 S. Ct. 633, 636, reh'g denied, --- U.S. ----, 117 S. Ct. 1024 (1997); United States v. Frazier, 89 F.3d 1501, 1506 (11th Cir. 1996); United States v. Averi, 922 F.2d 765, 766 (11th Cir. 1991). Courts have uniformly rejected the Double Jeopardy and Due Process arguments Barakat makes, because "the defendant is punished only for the fact that the present offense was carried out in a manner that warrants increased punishment." Watts, 117 S. Ct. at 636. Moreover, the

9

burden of proof the government carries in a sentencing hearing is the preponderance of the evidence standard, not the "beyond a reasonable doubt" standard.   See id.   at 637 (citing Witte v. United States, 515 U.S. ---, ---, 115 S. Ct. 2199, 2207-08 (1995)). Therefore, the district court was free to consider Barakat's conduct which formed the basis of the mail fraud conspiracy charge as long as it was established by a preponderance of the evidence.

### 2. Whether Barakat Received More Than $10,000 From Criminal Activity

The record before us indicates that the finding that Barakat had failed to report more than $10,000 in income from criminal activity was not clearly erroneous, either.  Much of the evidence at trial was directed at proving that Barakat illegally received the income.  The government introduced evidence of a scheme in which Barakat helped Benton Mortgage get business, whether by recommendation or by using his position with the Authority more directly, and in return he would receive "kickbacks" for that service.  Although the jury found that the government had not proven the mail fraud conspiracy count beyond a reasonable doubt, the district court did not clearly err in finding that a preponderance of the evidence proved Barakat had received the unreported income from criminal activity.

Furthermore, the district court did not clearly err in finding that Barakat's unreported criminal income exceeded $10,000. IRS Special Agent Steven Musgrave testified that the entire $15,000 paid by Benton Mortgage to Fields' trust account was attributable

10

to Barakat. The district court accepted that testimony, finding that Fields was merely a "conduit," so that the entire amount was income to Barakat. The district court did not clearly err in finding that Barakat had received more than $10,000 in income from his criminal activity. See Anderson v. City of Bessemer City, 470 U.S. 564, 575, 105 S. Ct. 1504, 1512 (1985)(recognizing that a trial court's finding based on a decision to credit the testimony of one of two or more witnesses, which extrinsic evidence does not contradict, can virtually never be clear error); Krys v. Lufthansa German Airlines, 119 F.3d 1515, 1523 (11th Cir. 1997). Whether he received that amount in any one year is another matter.

### 3. Whether Or Not the More Than $10,000 In Income From Criminal Activity Was Received In One Year

Barakat contends that the district court erred by concluding that he received the $15,000 in "one year." He points to the undisputed evidence that a $5,000 check from Benton Mortgage was deposited into Fields' trust account in December of 1988 and a $10,000 check was deposited in January of 1989. Because Barakat used a calendar year as his tax reporting period and the checks arrived in different calendar years, he argues he did not fail to report more than $10,000 in any one year.

The government argues that the district court was correct, because Barakat received the money during a time period of less than one year, i.e. less than twelve months, even though that time period spanned parts of two calendar years. Counting from either Benton Mortgage's payments to the trust account or from the checks to Barakat, Barakat did receive all of the money in a twelve-month

11

period spanning parts of 1988 and 1989.  Therefore, the government asserts, he failed to report more than $10,000 in income in one year.

The resolution of this issue depends on the definition of a "year" for the purposes of U.S.S.G. § 2T1.1(b)(1).  The language of the Sentencing Guidelines is to be given its plain and ordinary meaning.  See United States v. Tham, 118 F.3d 1501, 1506 (11th Cir. 1997); United States v. Pompey, 17 F.3d 351, 354 (11th Cir. 1994); United States v. Wilson, 993 F.2d 214, 217 (11th Cir. 1993); United States v. Strachan, 968 F.2d 1161, 1163 (11th Cir. 1992).  The plain and ordinary meaning of a word depends on its context.  As Justice Holmes eloquently put it in another case involving income tax, "a word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." Towne v. Eisner, 245 U.S. 418, 425, 38 S. Ct. 158, 159 (1918).

The § 2T1.1(b)(1) enhancement only applies to offenses involving taxation.  See U.S.S.G. § 2T (title and introductory comment).  The measuring rod for tax offenses, especially reporting offenses, is almost invariably the taxable year.  The taxable year is defined by 26 U.S.C. § 441.  Because Barakat, like the overwhelming majority of personal income tax filers, did not keep accounting records, § 441(g) applied and his "taxable year" was the calendar year, see 26 U.S.C. § 441(g), a point the government does not dispute.  26 U.S.C. § 6012 imposes an obligation to file a tax return each taxable year, and the statute under which Barakat was

12

convicted, 26 U.S.C. § 7206(1), criminalizes willfully making a false return.  As these statutes applied in this case, Barakat was convicted of making a false return for calendar year 1989. Therefore, for the purposes of applying § 2T1.1(b)(1), "year" means taxable year, which in this case is the 1989 calendar year.

The government concedes that Barakat did not receive more than $10,000 from criminal activity in 1989.  Therefore, we hold he did not fail to report more than $10,000 from criminal activity in calendar year 1989 -- the "one year" for the purposes of § 2T1.1(b)(1).  The district court erred by giving Barakat a four-level enhancement pursuant to that provision.

B. THE § 3B1.3 ENHANCEMENT FOR "ABUSE OF A POSITION OF TRUST"

The district court also gave Barakat a two-level enhancement pursuant to U.S.S.G. § 3B1.3 for the abuse of a position of trust, because he used his position at the Authority to help Benton Mortgage get business.  Barakat contends that the district court should not have imposed the abuse of trust enhancement upon him, because any abuse of trust was unrelated to the offense for which he was convicted, tax evasion.  The government contends that the district court was correct, because absent Barakat's abuse of his position of trust, he could not have committed the offense for which he was convicted.

The resolution of this issue depends on our delineation of the boundaries of what is an abuse of trust for the purposes of § 3B1.3. That section of the Sentencing Guidelines provides:

> If the defendant abused a position of public or private trust, or used a special skill, in a manner that

13

> significantly facilitated the commission or concealment of the offense, increase [the sentence] by two levels.

The commentary provides an elaboration about which abuses of trust are contemplated by the guideline:

> The position of trust must have contributed in some substantial way to facilitating the crime and not merely have provided an opportunity that could easily have been afforded to other persons. . . .

U.S.S.G. § 3B1.3, comment. (n.1).

This Court's case law is lean on the issue of when an abuse of trust facilitates or contributes in a significant way to the commission or concealment of an offense. In United States v. Mullens, 65 F.3d 1560, 1566 (11th Cir. 1995), we noted that the Sentencing Guidelines require that the abuse of trust "must have contributed in some significant way to facilitating the commission or concealment of the offense," but, our holding in Mullens was based on another ground, that the defendant's cultivation of ordinary social relationships did not place him in a "position of trust." See id. By contrast, in this case it is clear that Barakat was in a position of trust and that he abused that trust to obtain the income he did not report on his 1989 tax return.

Other circuits have addressed the issue now before us more directly. In United States v. Broderson, 67 F.3d 452, 456 (2d Cir. 1995), the Second Circuit held that an enhancement for an abuse of trust requires that the discretion or trust abused must have been placed with the defendant by the victim. Because the defendant in Broderson was placed in a position of trust by his employer but not by the government, which was the entity victimized by his

14

fraudulent statements, the § 3B1.3 enhancement was held not to apply. See id. at 455-56. Although we do not quarrel with the result in Broderson, the rule stated in that opinion may be too broad. Under that statement of the rule, an enhancement for abuse of trust might be precluded where a doctor uses his professional position and medical license to violate the controlled substance law. Or perhaps the Second Circuit would hold that that scenario falls within the Broderson rule, because the victim in such a case is society as a whole, which has entrusted the doctor with his professional position and license. In any event, we have held that a § 3B1.3 enhancement is appropriate in such circumstances. See United States v. Hoffer, --- F.3d ---, --- (11th Cir. Nov. 21, 1997).

The Seventh Circuit has applied the § 3B1.3 enhancement broadly. In United States v. Bhagavan, 116 F.3d 189, 190 (7th Cir. 1997), the defendant was convicted of income tax evasion and given a § 3B1.3 sentencing enhancement. Bhagavan had stolen money from the corporation he operated, thereby bilking his fellow shareholders out of a substantial amount of money. See id. He failed to report the embezzled funds and was convicted of tax evasion. The Seventh Circuit, rejecting Bhagavan's argument that the government was the only "victim" of tax evasion, held that because Bhagavan's "overall scheme" was to cheat the shareholders and not report the income, he could be given an enhancement for abusing his position of trust with the shareholders to acquire the income. See id. at 193. The Court explained:

15

> It is enough that identifiable victims of Bhagavan's overall scheme to evade his taxes put him in a position of trust and that his position 'contributed in some significant way to facilitating the commission or concealment of the offense.'

Id. (citation omitted).

However, Judge Cudahy dissented in Bhagavan, because he recognized that the majority had failed to tie the abuse of trust closely enough to the offense of conviction. He explained:

> [A]lthough minority stockholders may be victims of the diversion of revenue, they are not victims of the crime of conviction -- tax evasion -- or any other crime, for that matter. Thus, there is no nexus between the putative victims, the minority stockholders, and the crime of conviction, tax evasion. No nexus, no enhancement. . . .

Id. at 194 (Cudahy, J., dissenting).

We agree with Judge Cudahy's statement, however, we believe it is more accurate to phrase the required connection as between the abuse of the position of trust and the offense of conviction. That is how the Sentencing Guidelines themselves phrase it. They say that the defendant's abuse of trust must "significantly facilitate the commission or concealment of the offense." U.S.S.G. § 3B1.3. In this context, "offense" must be read as "offense of conviction" in order to maintain consistency with the definition of relevant conduct in U.S.S.G. § 1B1.3(a)(sentencing courts can only consider "relevant conduct," which is conduct related to the offense of conviction).

The Sentencing Guidelines provide examples of what constitutes "significant facilitation":

> This adjustment, for example, would apply in the case of an embezzlement of a client's funds by an attorney

16

> serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination.

U.S.S.G. § 3B1.3 comment. (n.1). In the three Sentencing Guidelines scenarios, the person in the position of trust has an advantage in committing the crime because of that trust and uses that advantage in order to commit the crime. It is much easier for an attorney who has been entrusted with a client's money to steal that money than for an ordinary criminal to do so.

Applying the concept drawn from those examples to this case, it is clear that Barakat did not use an advantage he, as distinguished from an ordinary criminal, had in order to commit the crime of tax evasion. The government's contention that Barakat abused his position of trust to obtain the income he did not report would broaden the crime of tax evasion to include the manner in which the income was obtained. However, the law prohibiting tax evasion is neutral as to the method by which the defendant obtained the income, caring not whether it was ill-gotten or richly deserved. The crime of tax evasion is simply the willful filing of a return known to be false. See 26 U.S.C. § 7206(a). Anyone with any kind of taxable income can do that. Barakat did not use his particular position of trust to give him an advantage in the commission or concealment of the offense of tax evasion. Therefore, we conclude that the district court should not have given Barakat a sentencing enhancement for abuse of a position of trust.

C. THE § 2T1.1(b)(2) ENHANCEMENT FOR USE OF SOPHISTICATED MEANS

17

The district court also gave Barakat a two-level enhancement pursuant to U.S.S.G. § 2T1.1(b)(2) for using "sophisticated means," channeling the payments from Benton Mortgage through Fields' trust account, in order to impede discovery of the existence or extent of the offense. Barakat challenges this enhancement, arguing that: (1) the use of an attorney's trust account could not be "sophisticated means" as a matter of law; and (2) because the use of the trust account was related to the mail fraud count, it was outside the scope of the "relevant conduct" which could be considered in sentencing him for his tax evasion conviction.

### 1. Standard of Review

This Court has addressed the issue of what "sophisticated means" are once before, and then only briefly. In United States v. Paradies, 98 F.3d 1266, 1292 (11th Cir. 1996), we held that the district court did not clearly err in enhancing the defendant's conviction for tax evasion where the evidence showed that the defendant routinely transferred money through shell corporations. Although reaching that conclusion in Paradies, we did not discuss in any detail the standard by which this Court would review the district court's application of the sophisticated means enhancement.

The Sentencing Guidelines explain that "sophisticated means . . . includes conduct that is more complex or demonstrates greater intricacy or planning than a routine tax-evasion case." U.S.S.G. § 2T1.1 comment. (n.4). This inquiry necessarily involves a comparison between the present case and the "routine" tax evasion

18

case, a comparison identical in nature to the inquiry a district court makes in determining whether a mitigating or aggravating factor takes a case out of the heartland thereby justifying a sentencing departure. Compare U.S.S.G. § 2T1.1 comment.(n.4) with U.S.S.G. § 5K2.0 ("An offender characteristic or other circumstance that is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range may [be used if it] distinguishes the case from the 'heartland' cases covered by the guidelines. . . ."). Therefore, we will take the standard of review prescribed by the Supreme Court in Koon v. United States, --- U.S. ---, 116 S. Ct. 2035 (1996), for reviewing § 5K2.0 departures and use it in reviewing a sophisticated means enhancement.

In Koon, the Supreme Court noted that findings of fact relevant to sentencing decisions are to be accepted unless clearly erroneous. See id. at 2046. That is essentially what this Court did in Paradies. See 98 F.3d at 1291 (accepting the district court's finding that the defendant had used shell corporations to conceal his income because it was not clearly erroneous). The Supreme Court did note in Koon that if the district court makes a ruling of law in its sentencing decisions, the court of appeals "need not defer to the district court's resolution of the point." 116 S. Ct at 2047. Therefore, we will review any rulings of law made by the district court in conjunction with the sophisticated means enhancement de novo.

## 2. Discussion

19

Barakat argues that in committing the offense of tax evasion, his only act was to misrepresent his 1989 income on his tax return. He asserts that because everyone fills out a tax form, his means of committing tax evasion are no different than the means used by anyone else, and therefore he cannot be said to have used "sophisticated means" to commit the offense of tax evasion. That contention misses the mark, because it focuses on the use of sophisticated means to <u>commit</u> a tax offense, while the enhancement focuses on the use of sophisticated means to <u>conceal</u> the tax offense. <u>See</u> U.S.S.G. § 2T1.1(b)(2) ("If sophisticated means were used to impede the discovery of the existence or extent of the offense, increase by 2 levels.").

Barakat also relies on <u>United States v. Stokes</u>, 998 F.2d 279 (5th Cir. 1993), to argue that he did not use "sophisticated means" to conceal his tax evasion. In <u>Stokes</u>, the Fifth Circuit held that the defendant's concealment of income from her accountant could not be "sophisticated means" for the purposes of § 2T1.1(b)(2). <u>See id.</u> at 282. With the <u>Stokes</u> holding in hand, Barakat argues that the use of attorney Fields' trust account was no more complex than concealing income from an accountant. We do not think that the holding of <u>Stokes</u> is applicable in this case. First, it is not clear that the <u>Stokes</u> court, which made its decision before <u>Koon</u> was decided, used the same standard of review that we use today. Because our review is for clear error, we give greater deference to the district court's finding that Barakat used sophisticated means

20

than the Stokes court appears to have given the district court's finding in that case.

Second, we do not think that merely failing to report income to an accountant, which is all that was involved in Stokes, is analogous to using an attorney's trust account. As the government points out, because Benton Mortgage paid the $15,000 to Fields' trust account, no IRS Form 1099 (used to report payments to non-employees) was generated. As a result, Barakat could fail to disclose the Benton Mortgage payments knowing that, in the absence of a Form 1099, it was unlikely the IRS would ever become aware of that income. Therefore, based on the evidence, we could not say that the district court clearly erred in finding that Barakat had used "sophisticated means" to conceal his tax evasion if we were convinced the district court's reasoning was untainted by any error of law.

However, more analysis is required. While this is essentially a factual issue, which is entrusted primarily to the district court, see Koon, 116 S. Ct. at 2047, Barakat asserts that the court committed legal error by taking into consideration conduct pertaining to the mail fraud conspiracy count when deciding whether to apply the § 2T1.1(b)(2) enhancement. If the district court took into consideration conduct which does not directly relate to the offense of conviction, it made an error of law. As noted above, see supra at 16-17, a district court is limited by § 1B1.3 to considering only conduct pertaining to the offense of conviction. Unless the use of sophisticated means significantly facilitates the

21

defendant's concealment of his tax evasion from the IRS, it is not relevant conduct for the purposes of § 2T1.1(b)(2). See Stokes, 998 F.2d at 282.

The district court stated that, had it considered only the evidence relating to the tax count, it would not have given Barakat an enhancement for either an abuse of trust or use of sophisticated means. We read that statement to mean the district court found that Barakat had used sophisticated means to conceal his mail fraud conspiracy, but not his tax evasion. If that is the district court's holding, it is error. However, it is unclear how the district court could consider only evidence relating to the tax count when it noted that the evidence relating to the mail fraud conspiracy and tax evasion charges was "inextricably intertwined." Given this uncertainty, and because the issue of whether the use of a trust account in these circumstances is a "sophisticated means" of concealing tax evasion is a close question,[1] we vacate the district court's imposition of this enhancement and remand for a reconsideration in light of our holding that only evidence relating to the tax evasion count may be considered in making the § 2T1.1(b)(2) decision.

## V. CONCLUSION

---

[1]Compare United States v. Rice, 52 F.3d 843, 849 (10th Cir. 1995)(sophisticated means enhancement inappropriate); Stokes, 998 F.2d at 282 (same), with United States v. Whitson, 125 F.3d 1071, 1075 (7th Cir. 1997)(sophisticated means enhancement appropriate); United States v. Furkin, 119 F.3d 1276, 1285 (7th Cir. 1997)(same); United States v. Lewis, 93 F.3d 1075, 1083 (2d Cir. 1996)(same).

22

Barakat's conviction for tax evasion is AFFIRMED.  We VACATE his sentence and REMAND to the district court for further proceedings consistent with this opinion.