134 F.3d 375
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Rockey MORSE, Defendant-Appellant.
 No. 97-1304.
 United States Court of Appeals, Seventh Circuit.
 Argued Dec. 16, 1997.
Decided Jan. 12, 1998.
 
 Before ESCHBACH, FLAUM, and EVANS, Circuit Judges.
 
 ORDER
 
 1
 Rockey Morse entered guilty pleas to the first three counts of a four-count indictment. Count 1 charged him with conspiracy to distribute and possess with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Count 2 charged him with conspiracy to distribute and possess with intent to distribute marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Count 3 charged him with possession with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a)(1). Morse was sentenced to 121 months imprisonment on each count, to be served concurrently. Morse appeals, arguing that the district court clearly erred in its determination that his relevant conduct included 163 grams of actual methamphetamine. He also argues that he deserved a guideline reduction for acceptance of responsibility.
 
 
 2
 Morse and several codefendants, located in southern Illinois, were supplied with methamphetamine and marijuana by codefendant Baltazar "Jessie" Bermudez of Kansas City, Kansas. The drugs were supplied from June 1994 to December 1995. Morse would either personally obtain the drugs or arrange for codefendants Michael and Robert Crane to retrieve drugs from Bermudez in Kansas City or, on some occasions, from St. Louis, Missouri, or Grand Tower, Illinois.
 
 
 3
 On December 21, 1995, law enforcement agents stopped Michael and Robert Crane in Cahokia, Illinois, after a controlled buy had been made from the Cranes by a cooperating witness. The Cranes were searched, pursuant to a search warrant, and the agents recovered two and a half ounces of methamphetaine from Robert Crane and one ounce from Michael Crane. They also found two pounds of marijuana in the truck that the Cranes had been driving. Michael Crane informed the agents that he, Robert, and Morse had made arrangements for him (Michael) to go to Kansas City to pick up four ounces of methamphetamine and a package of marijuana from Bermudez and to transport it back to Illinois. He also told the agents that Morse would arrange for people to obtain marijuana and methamphetamine from Bermudez on credit and that after the individuals sold the drugs they would give the purchase cost of the drugs to Morse, who would send it to Bermudez.
 
 
 4
 Based on this information the agents set up a controlled delivery of the marijuana by Michael Crane to Morse on the same day, December 21, 1995. After the delivery a search warrant was executed on Morse's residence and the drugs were recovered. The search also revealed several weapons and numerous postal money orders that Morse and Cindy Vincent, who lived with Morse for 12 years, had sent to Bermudez. Morse was arrested after the search was conducted. Vincent informed agents that she was aware that ounce quantities of methamphetamine had been ordered along with the marijuana coming to Morse. She further stated that she had overheard phone conversations where drugs had been ordered and that Robert Crane was the primary individual ordering and receiving shipments of methamphetamine through Morse and Bermudez. The agents set up another controlled buy on December 22, 1995, in which Michael Crane, in cahoots with the FBI, ordered and received three ounces of methamphetamine from Bermudez's wife (Donna) in St. Louis.
 
 
 5
 Based on the investigative reports and statements from the codefendants, the presentence investigation report (PSR) estimated that Morse was responsible for approximately 26 pounds of marijuana and 737.1 grams of a substance or mixture containing methamphetamine. This figure was calculated based on a statement from Bermudez that every 2 to 3 weeks Morse arranged to obtain one to three pounds of marijuana and three ounces of methamphetamine.[1] The PSR based its determination on an estimate of distribution through Morse of one pound of marijuana and one ounce of methamphetamine every 3 weeks between June 1994 and December 1995. The weakest purity level of five quantities of seized methamphetamine in this case was 26 percent. Accordingly, the PSR multiplied the 737.1 grams of substance or mixture containing methamphetamine by a purity factor of 26 percent to determine that Morse's relevant conduct was 191.6 grams of actual methamphetanine.[2]
 
 
 6
 Morse did not contest the attribution to him of 26 pounds of marijuana. The marijuana did not affect the calculation of his sentencing guideline range because, pursuant to U.S.S.G. §§ 3D1.2(d) and 3D1.3(b), his three drug counts were compiled into a single group and his base offense level was calculated based on the aggregate quantity of drugs involved.[3] However, Morse objected to the PSR's calculation of the amount of methamphetamine attributed to him. Morse testified at sentencing that he had a suspicion that there may have been methamphetamine transactions taking place between Bermudez and the Cranes but that he was not a party to these drug purchases. He argued that he was only involved with approximately two to three ounces of methamphetamine.[4] Morse testified that in June 1995, when he went to Kansas with Robert Crane to look for his son, they ran into Bermudez. Morse admitted that on that day, Robert Crane purchased an ounce of methamphetamine from Bermudez. Morse further admitted that he participated in another methamphetamine related transaction for approximately two ounces. Morse became involved in the second transaction when Bermudez called him from jail and asked him to collect money that the Cranes owed him for methamphetamine. Morse received $3,000 from the Cranes and took another $1,000 out of his own pocket to pay Donna Bermudez the $4,000 that the Cranes owed Bermudez.
 
 
 7
 At sentencing the government called FBI Agent Brenn Tallent as a witness. Morse took the stand in his own defense and also called Bermudez and the two Cranes as witnesses. Each of the witnesses, other than Morse, testified that Morse was either directly or indirectly involved with every methamphetamine transaction. These witnesses testified that at first Morse would phone in the methamphetamine orders along with his marijuana orders, but that eventually the Cranes went directly to Bermudez. However, the witnesses testified that Morse was still aware of each transaction, still got his cut of money for the methamphetamine transactions, and that Morse was sometimes called by Bermudez to confirm or be informed of the transactions.
 
 
 8
 After hearing the evidence at sentencing, the district court found that all of the witnesses, except Morse, were credible. The court further stated that the witnesses' testimony corroborated each other's statements, except for some minor differences on dates.
 
 
 9
 The district court reached a slightly different estimation than the PSR for the amount of methamphetamine attributable to Morse. The court noted that Bermudez testified that the methamphetamine transactions did not actually start until May 1995 and that two to four ounces of methamphetamine were provided to Morse every 1 to 3 weeks. The court determined that Morse's relevant conduct included 163 grams of actual methamphetamine based on a conservative estimate of one delivery of two ounces of methamphetamine every 3 weeks.[5] This amount of actual methamphetamine gave Morse an offense level of 32. The district court also denied Morse a reduction for acceptance of responsibility because he testified that he only had vague knowledge of the methamphetamine transactions. With an offense level of 32 and a criminal history category of I, Morse had a sentencing range of 121 to 151 months. The district court sentenced him at the low end of the range to 121 months imprisonment on each count, to be served concurrently.
 
 
 10
 On appeal Morse first argues that his relevant conduct should be at most five ounces of a mixture containing methamphetamine. The first ounce is apparently from the June 1995 transaction, and the other four are from the § 4,000 that he collected and paid to Donna Bermudez in December 1995. Five ounces of methamphetamine at 26 percent purity is equivalent to 36.9 grams of actual methamphetamine and would result in a base offense level of 26. He alternatively argues that if the testimony of the codefendants is credited he can be linked to at most six transactions involving two ounces each. Twelve ounces of methamphetamine at 26 percent purity is equivalent to 88.4 grams of actual methamphetamine and would result in a base offense level of 30. Morse additionally asserts that he is entitled to a reduction for acceptance of responsibility because he pleaded guilty.
 
 
 11
 We review the district court's factual determination of the amount of drugs attributable to a defendant for clear error. United States v. Magana, 118 F.3d 1173, 1205 (7th Cir.1997). This court should not conclude that a finding of fact is clearly erroneous "unless upon review it is left 'with a definite and firm conviction that a mistake has been committed.' " United States v. Herrera, 54 F.3d 348, 356 (7th Cir.) (quoting United States v. Herrera, 878 F.2d 997, 1000 (7th Cir.1989)), cert. denied sub nom. Crespo v. United States, 116 S.Ct. 192 (1995); United States v. House, 110 F.3d 1281, 1283-84 (7th Cir.), cert. denied sub nom. Hughes v. United States, 118 S.Ct. 199 (1997). "[I]f two permissible views exist, the fact-finder's choice between them cannot be clearly erroneous." United States v. Taylor, 72 F.3d 533, 546 (7th Cir.1995) (quoting United States v. McDonald, 22 F.3d 139, 144 (7th Cir.1994)). At sentencing the government must establish by a preponderance of the evidence the quantity of drugs that was reasonably foreseeable to an individual defendant. United States v. Edwards, 115 F.3d 1322, 1326 (7th Cir.1997).
 
 
 12
 Relevant conduct includes "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense[ ]" U.S.S.G. § 1B1.3(a)(1). In order for conduct to be relevant it must both be in furtherance of the conspiracy and reasonably foreseeable to the defendant. U.S.S.G. § 1B1.3, comment. (n. 2); see United States v. Lewis, 110 F.3d 417, 423 (7th Cir.), cert. denied, 118 S.Ct. 149 (1997).
 
 
 13
 Morse argues that the quantity of methamphetamine attributable to him should be less than the amount determined by the district court because "[t]he evidence concerning [his] participation in the methamphetamine conspiracy is widely divergent, contradictory, and inconclusive." In making this assertion he invites us to reconsider the credibility of the witnesses. However, "[i]t is not the task of this appellate court to reconsider the evidence or assess the credibility of the witnesses." United States v. Hickok, 77 F.3d 992, 1006 (7th Cir ) (quoting United States v. Mojica, 984 F.2d 1426, 1435 (7th Cir.1993)), cert. denied, 116 S. Ct 1701 (1996).
 
 
 14
 As this court has held countless times, sentencing judges are fully capable of considering the motivations of witnesses in weighing conflicting evidence and, because they have had an opportunity to assess the demeanor of the witnesses, are in a better position than this court to make credibility determinations. For this reason, arguments which simply urge a reassessment of a district court's credibility determination "are wasted on an appellate court."
 
 
 15
 House, 110 F.3d at 1285-86 (citations omitted and quoting United States v. Molinaro, 877 F.2d 1341, 1347 (7th Cir.1989)).
 
 
 16
 Morse testified that he only had a suspicion that methamphetamine transactions may have been taking place and that he should only be held accountable for either 5 or 12 ounces of a mixture containing methamphetamine. In direct contrast to Morse's testimony, Bermudez, Robert Crane, and Michael Crane testified that Morse knew of and profited from each methamphetamine transaction between Bermudez and the Cranes The district court found that the testimony of Morse was incredible but the testimony of the other witnesses was credible. Each witness testified that Morse was either directly or indirectly involved with every methamphetamine transaction. Further, their testimony is corroborated by the postal money orders to Bermudez that were recovered from Morse's residence, along with the statements of Vincent that Bermudez was Morse's source for both marijuana and methamphetamine. Therefore, the methamphetamine transactions were reasonably foreseeable to Morse and in furtherance of the jointly undertaken criminal activity. Additionally, the district court's conservative calculation of the amount of methamphetamine involved based on the evidence and testimony is the type of reasonable estimate that a sentencing court is entitled to make. United States v. Rodriguez, 67 F.3d 1312, 1325 (7th Cir.1995) ("sentencing courts may make reasonable estimates as to drug quantities"), cert. denied, 116 S.Ct. 1582 (1996). Given this evidence, we conclude that the district court did not clearly err in making its relevant conduct determination.
 
 
 17
 Morse also asserts that the district court improperly denied him a 3-point offense level reduction for acceptance of responsibility and the timeliness of his plea of guilt, pursuant to U.S.S.G. § 3E1.1. "The district court's finding regarding acceptance of responsibility is one of fact that depends primarily upon credibility assessments and is reviewed for clear error." United States v. Whitson, 125 F.3d 1071, 1075 (7th Cir.1997).
 
 
 18
 Application Note I to the acceptance of responsibility guideline states:
 
 
 19
 In determining whether a defendant qualifies [as accepting responsibility] ... appropriate considerations include, but are not limited to, the following:
 
 
 20
 (a) truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct).... However, a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility[.]
 
 
 21
 U.S.S.G. § 3E1.1, comment. (n. 1(a)).
 
 
 22
 The determination of the sentencing judge is entitled to great deference on review because the "judge is in a unique position to evaluate a defendant's acceptance of responsibility." U.S.S.G. § 3E1.1, comment. (n. 5); United States v. Jones, 52 F.3d 697, 700 (7th Cir.1995). This deference is given because the district court is in a better position to evaluate the demeanor and statements of the defendant and assess whether he is motivated by a genuine acceptance of responsibility or a self-serving desire to minimize his own punishment. United States v. Akindele, 84 F.3d 948, 957 (7th Cir.1996). Moreover, it is the defendant's burden to show that he has clearly accepted responsibility for his offense. Jones, 52 F.3d at 701.
 
 
 23
 The district court denied Morse a reduction for acceptance of responsibility because Morse falsely denied his relevant conduct for the offenses of conviction. The district court found that Morse did not accept responsibility due to his testimony that he only "had suspicion" that methamphetamine transactions were taking place between Bermudez and the Cranes. Morse also denied that he was a partner of Bermudez in the distribution of methamphetamine in southern Illinois. As previously noted, the district court found that Bermudez, Robert Crane, and Michael Crane each gave credible testimony about Morse's involvement with the methamphetamine transactions. Morse's denial of relevant conduct stood in sharp contrast to the testimony of the other witnesses.
 
 
 24
 To support his position that he is entitled to a reduction for acceptance of responsibility, Morse relies on United States v. Vance, 62 F.3d 1152 (9th Cir.1995), for the proposition that "the sentencing court cannot accept [Morse's] plea and then decide that Morse has not truthfully admitted his guilt." Despite Morse's argument that there is little difference between his case and Vance, the two are easily distinguishable. In Vance the district court improperly denied a reduction for acceptance of responsibility after a defendant pleaded guilty, based in part on the fact that after pleading guilty the defendant refused to discuss the offense with the probation officer and filed a motion to suppress evidence. Vance, 62 F.3d at 1157. This is significantly different than this case, where the district court found that Morse testified untruthfully and denied relevant conduct. Additionally, this court has consistently upheld the denial of a reduction for acceptance of responsibility when the district court finds that despite pleading guilty the defendant has falsely denied relevant conduct. Whitson, 125 F.3d at 1075 (citing cases). Therefore, we hold that the district court was not clearly erroneous in denying Morse a reduction for acceptance of responsibility.
 
 
 25
 AFFIRMED.
 
 
 
 [1]
 At sentencing Bermudez testified that the methamphetamine transactions did not began until approximately May 1995, after the marijuana purchases had started. Bermudez also testified that two to four ounces of methamphetamine were provided to Morse every 1 to 3 weeks
 
 
 [2]
 The quantity was converted to actual methamphetamine pursuant to U.S.S.G. § 2D1.1(c) n. * (B) because it resulted in a higher offense level than if the full weight of the substance containing methamphetamine had been used
 
 
 [3]
 The 26 pounds of marijuana is approximately equivalent to 1 gram of actual methamphetamine
 
 
 [4]
 However, on appeal Morse argues that his relevant conduct should be at most five ounces for the two transactions that he was involved in by his own admission. Alternatively, he argues that even if his codefendants' testimony is credited, he should only be held accountable for 12 ounces of a substance or mixture containing methamphetamine. These arguments completely ignore the aspect that Morse was involved in a drug conspiracy
 
 
 [5]
 Although the district judge did not spell out how he reached this calculation, it seems he did so in the following manner. There are 33 weeks from May 1995 through December 21, 1995, which results in an estimate of 11 deliveries, at one every 3 weeks. The judge did note that his estimate was lower than the 13-15 transactions that Robert Crane testified took place. Estimating 2 ounces for each delivery results in 22 ounces, or 623.7 grams of a mixture containing some methamphetamine. That number of grams of a mixture at the 26 percent weakest purity percentage equals 162 grams of actual methamphetamine. The 26 pounds of marijuana is approximately equivalent to 1 gram of actual methamphetamine, thereby yielding the district court's total of 163 grams of actual methamphetamine. This amount falls squarely within the range of 100 to 300 grams of actual methamphetamine, which corresponds to an offense level of 32